**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of The Bank for Savings, Plaintiff,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant.**

**INSURANCE COMPANY OF NORTH AMERICA, Third Party Plaintiff,**

v.

**Paul J. BONAIUTO and Delores DiCologero, Third Party Defendants.**

Civil Action No. 94–11078–REK.

United States District Court, D. Massachusetts.

March 15, 1996.

Ben L. Fernandez, David R. Jimenez, Fitzhugh & Associates, Boston, MA, Evan S. Widlitz, Kathleen M. Balderston, Sharon P. Carlstedt, Reid & Priest, New York City,

Leila R. Kern, Kern, Hagerty, Roach & Carpenter, Boston, MA, for Plaintiff.

Francis J. Gallagher, Gerald W. Motejumas, Lecomte, Emanuelson & Tick, Boston, MA, for Defendant.

## Opinion

KEETON, District Judge.

This action was brought by the Federal Deposit Insurance Corporation ("FDIC") as Receiver of The Bank for Savings ("Bank") against Insurance Company of North America ("INA"). FDIC seeks to recover on a Financial Institution Bond ("Bond") for losses suffered by the Bank and allegedly insured under the Bond. Before the court at this time is the Defendant's Motion for Summary Judgment (Docket No. 19, filed August 15, 1995). Because I conclude that the undisputed evidence on the record shows that the Bank's notice to INA was not timely, FDIC is barred from seeking payment on the Bond. The motion for summary judgment will be allowed.

### I

The events that gave rise to a possible claim under the Bond occurred before the Bank was declared insolvent and the FDIC was appointed receiver. The FDIC has alleged, however, that the events at issue in this litigation helped to bring about the financial demise of the bank. On March 20, 1992, the Massachusetts Commissioner of Banks declared the Bank an insolvent institution and appointed the FDIC as receiver.

Before the FDIC was appointed receiver, while the Bank was still solvent, the Bank obtained, as required by law, a Standard Form No. 24 Financial Institution Bond from INA. The Bond covered claims made from January 1, 1988 to April 1, 1989. It was later extended by agreement of the parties to September 1, 1990. The Bond describes in great detail which losses are insured under its provisions. Insured losses include those associated with such risks as employee fraud, robbery, forgery and securities violations.

The section at issue in the present case is entitled "Fidelity." This section states that the following losses are insured under the Bond:

(A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

(a) to cause the Insured to sustain such loss, and

(b) to obtain financial benefit for the Employee or another person or entity.

However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500.

The FDIC alleges that the actions of two employees of the Bank, Delores DiCologero ("DiCologero") and Paul Bonaiuto ("Bonaiuto"), caused the Bank to sustain losses insured under the "Fidelity" section of the Bond.

At the times relevant to this litigation, DiCologero was an Assistant Vice President of the Bank and the manager of the Bank's mortgage department. Bonaiuto was an attorney employed by the Bank to represent it in closing mortgage loans.

The FDIC alleges that from 1985 to 1989, DiCologero and Bonaiuto conspired with a group of real estate developers (the "Rostoff Group") to cause the Bank to make certain loans in violation of the Bank's internal lending policies and banking regulations. It is alleged that the conspiracy among DiCologero, Bonaiuto, and the Rostoff Group caused the Bank to make over 500 such wrongful mortgage loans to individuals who then used the proceeds to purchase condominiums from the Rostoff Group. The aggregate face value of the loans in question is in excess of $30 million. Many of these loans ended up in default.

The primary and recurring violation of banking regulations and policies allegedly involved in the scheme was that the Bank made loans for the full value of condomini-

ums being purchased. The conspirators were able to cause the Bank to do this by over-stating the purchase price of the condominiums in official loan documentation—indicating that the purchaser had equity in the value of the property. In fact, the purchasers usually did not have any equity in the properties, and the loans were therefore for 100% of the value of the property.

The conspirators allegedly circumvented sound banking policies by having the loan documentation reflect that a down payment had been made, when, in fact, no such down payment had actually been made. After investigation, it was learned that this "down payment" usually took the form of a "discount" in the purchase price. Thus, the purchase price listed in the loan documents was 10%–20% greater than the actual purchase price of the property, and when the Bank then loaned the purchaser up to 80% of the over-stated purchase price, it effectively loaned an amount equal to 100% of the value of the property. Regulations prohibit financing greater than 80% of the value of a property in the normal course of business.

The conspiracy also involved other violations of sound banking practices. The Bank was often the lender for over one-third of the condominium units in a given development, even though internal regulations clearly prohibited participation in excess of 33% of a particular development. Moreover, DiCologero allegedly approved many of the mortgages in an expedited fashion, without any investigation of the creditworthiness of the applicants. Many mortgages were approved for the same individuals, so that certain individuals purchased multiple Rostoff condominiums. Often, the applications were incomplete and the applicants clearly did not have the resources to incur such debt.

Bonaiuto allegedly prepared many of the fraudulent closing documents, knowing that the documents were incomplete and inaccurate.

The alleged over-stated value of the condominiums reported in the loan documentation was often supported by an appraisal done by Marc DiCologero, son of Delores DiCologero. Marc DiCologero allegedly received in excess of $33,000 from the Rostoff Group in return

for his work. Also, Doris DiCologero, daughter of Delores DiCologero, allegedly received in excess of $4,500 from the Rostoff Group in return for typing up loan applications.

Michael DiCologero, Delores' husband, also allegedly profited from the Rostoff Group. He allegedly received $12,000 in referral fees for his efforts, along with those of his wife Delores, in directing potential condominium purchasers to the Rostoff Group. Michael DiCologero also purchased a condominium, himself, from the Rostoff Group without paying any deposit. The loan documentation supplied to the Bank for Michael DiCologero's purchase indicated that he had paid a deposit of $7,700.

Bonaiuto also allegedly received compensation from the Rostoff Group. He purchased two condominiums from the Rostoff Group for himself and his wife, and he borrowed money from the Bank for each purchase. Notwithstanding the fact that he and his wife were listed as the borrowers on the mortgage loans, Bonaiuto acted as counsel for the Bank in the loan closings. The loan documentation for these two purchases indicated that Bonaiuto had made down payments, paid closing costs, and had taken second mortgages from the Rostoff Group to cover some of the costs of purchase. These costs allegedly paid by Bonaiuto were in excess of $27,000. In fact, the down payments and closing costs were never made, or were refunded by the Rostoff Group. Moreover, the Rostoff Group never sought to enforce its second mortgage on Bonaiuto's condominiums.

On January 1, 1992, a federal grand jury in Massachusetts indicted DiCologero, Bonaiuto, and the members of the Rostoff Group on 87 counts including conspiracy, bank fraud, and false statements. On September 9, 1992, the defendants were found guilty of some but not all of the charges. DiCologero was convicted on three of the eighty-seven counts; Bonaiuto was convicted on eleven of the eighty-seven counts.

The FDIC alleges that the Bank suffered losses in excess of $10 million when the borrowers defaulted on the fraudulently ob-

tained mortgages, and it claims that the fraudulent actions of DiCologero and Bonaiuto directly caused the Bank to suffer harm. FDIC seeks reimbursement for those losses—up to the full amount of the Bond, $4 million.

## II

The current motion for summary judgment involves only issues to which Phase I of discovery was relevant. The only issues now before the court involve the timeliness of various steps taken by FDIC and the Bank, its predecessor in interest, to perfect the Bank's claim under the Bond. The first such issue, and the issue upon which I conclude summary judgment is warranted, is whether the Bank's Notice of Potential Loss, sent to INA on January 16, 1990, was timely.

Various provisions in the Bond required the Bank to inform INA if the Bank became aware of a potential claim under the Bond. The specific provisions state:

**Section 3.**

This bond applies to loss discovered by the Insured during the Bond Period. Discovery occurs when the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when the Insured receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would constitute a loss under this bond.

. . . .

**Section 5.**

(a) at the earliest practicable moment, not to exceed 30 days, after discovery of loss, the Insured shall give the Underwriter notice thereof.

It is undisputed that the Bank first gave notice to INA, as defined in Section 5 of the Bond, on January 16, 1990.

The Bond provisions at issue form part of an insurance contract made in Massachusetts. Thus, Massachusetts law of contracts is controlling as to the interpretation of the contractual terms. The FDIC, however, rather than calling attention to Massachusetts law, has directed the court to various analogous cases from other states and from federal courts sitting in other states.

FDIC has asserted that the motion for summary judgment can be easily decided because "[t]he date of discovery should be determined by the jury." Docket No. 23 at 4; *citing FDIC v. CNA Casualty of Puerto Rico*, 786 F.Supp. 1082, 1088 (D.P.R.1991). This is true, however, only if there is a genuine dispute of fact that is material to determining the date of "discovery" of loss by the Bank. *See, e.g., Chas T. Main, Inc. v. Fireman's Fund Ins. Co.*, 406 Mass. 862, 551 N.E.2d 28 (1990) (affirming the trial court's grant of summary judgment for the defendant because of the untimeliness of the notice of claim.)

Neither party has called attention to any binding precedent purporting to override the manifested intent of the parties in relation to the contractual provisions at issue. Thus, the rights of the parties are controlled by the terms of their contract. As to the court's interpretation of those terms, "it is a contract provision we are interpreting, and meaning is to be extracted in the usual, commonsense ways." *Morin v. Massachusetts Blue Cross, Inc.*, 365 Mass. 379, 311 N.E.2d 914 (1974).

## III

Notice requirements in insurance policies generally play an important role in ensuring a workable system of insurance. Reporting requirements "permit an insurer to make an investigation of the facts and occurrence relating to liability." *Chas T. Main, Inc. v. Fireman's Fund Ins. Co.*, 406 Mass. 862, 551 N.E.2d 28, 29 (1990). Thus, such requirements help to facilitate fairness in rate setting. *Id.*

Another purpose of reporting requirements in insurance contracts is the protection of insurance companies (and others who

depend on the solvency of the insurance companies) against fraud and moral hazard:

> [T]he obvious purpose of the requirement of written notice to the insurer under a fidelity bond is for the benefit of the insurer, and for reasons quite consistent with public interest in avoiding an incentive structure in which the existence of fidelity insurance might become an inducement to an employer to take risks of potential fraud of employees that an employer who had no fidelity coverage would not take. In short, the requirement of written notice when the possibility of a claim is first discovered, rather than allowing notice to be deferred until proof of fraud is in hand, is entirely compatible with public interest.

*Boston Mut. Life Ins. Co.*, 613 F.Supp. at 1105 (*citing Gilmour v. Standard Surety & Casualty Co.*, 292 Mass. 205, 197 N.E. 673 (1935)).

As other cases and treatises have explained, it is not only notice, which is essential, but timely notice:

> The primary purpose of a notice requirement in an insurance policy is to afford the insurer a reasonable opportunity to protect its rights. Prompt notice to the insurer maximizes an insurer's opportunity to acquire information about the circumstances of a loss (usually by way of a timely investigation when witnesses are most likely to be available and while their memories of the events are generally the most accurate, as well as when there is usually the best opportunity to examine, record, or preserve any physical evidence), which may be important both (1) to the insurer's determinations in regard to whether a loss is covered and (2) to the preparation of a defense to claims by a third party against an insured who is covered by a liability insurance policy.
>
> Timeliness provisions relating to the filing of claims are sometimes justified by insurers on the basis that they facilitate investigations which may ferret out fraudulent claims because fraud is best detected when the evidence is "fresh."

Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 7.2(b) at 753, 759 (1988) (citations omitted).

■ Indeed, with respect to policies like the Bond in this case, timely notice of the loss is so important that INA does not need to show actual prejudice resulting from the delay in giving notice. If notice to INA was untimely, the Bank is precluded from recovery, regardless of whether INA can prove any actual prejudice as a result of the delay. *J.I. Corp. v. Federal Ins. Co.*, 920 F.2d 118, 120 (1st Cir.1990) (*interpreting Johnson Controls v. Bowes*, 381 Mass. 278, 409 N.E.2d 185 (1980)).

## IV

Before I consider whether the undisputed evidence in this case shows that the Bank's notice to INA was untimely because the Bank "discovered" the loss more than 30 days before January 16, 1990, I must determine what exactly is meant by the term "discovery," as defined in the Bond. The standard to be applied in determining whether "discovery" has occurred under this definition is a blend of subjective (state-of-mind) and objective ("reasonable person") elements. The analysis that follows breaks apart this definition of discovery into three segments. The issue concerning what level of "awareness" is necessary is considered in part A. The issues concerning what "facts" one must become aware of to constitute "discovery" are considered in parts B and C.

### A. *"Discovery occurs when the Insured first becomes aware of facts...."*

■ Many courts have explored the potential meaning of a discovery standard based on "awareness." Litigants often argue over whether such a term implies a subjective standard (whether the party was *actually* focusing attention upon the material "facts"), or an objective standard (whether a reasonable person would have been focusing attention upon those "facts"). *See, e.g., Boston Mut. Life Ins. Co. v. Fireman's Fund Ins. Co.*, 613 F.Supp. 1090 (D.Mass.1985) (interpreting *Gilmour v. Standard Surety & Casualty Co.*, 292 Mass. 205, 197 N.E. 673 (1935)); *Midland Bank and Trust Co. v. Fidelity and Deposit Co. of Maryland*, 442 F.Supp. 960 (D.N.J.1977).

Although in other contexts a consideration of the possible meaning of "awareness" might be essential to a decision under Massachusetts law, I conclude that it is unnecessary in the circumstances of this case. As I explain in Part V of this Memorandum, I conclude that, in this case, it is indisputable that the Bank was actually aware of facts and had drawn inferences amounting to "discovery," as defined in the Bond, before December 16, 1989 (30 days before the date notice was given to INA). Thus, for the purposes of this case, I need not and do not decide whether the language in the bond would impose an obligation if a "reasonable person" *would have* become aware of such facts but no person for whose state of mind the Bank is legally accountable had become aware of such facts. The Bank, through its agents, *actually was aware* of facts constituting "discovery" before December 16, 1989, and thus it was obligated to inform INA at that time.

*B. "which would cause a reasonable person to assume...."*

■ A more difficult question in this case involves what exactly the Insured must be aware of in order for "discovery" to have occurred? Stated more concisely, the question is: "Aware of what facts?"

The contract language says the answer to this question is "facts which would cause *a reasonable person to assume* that a loss of a type covered by this bond has been or will be incurred...." (emphasis added). Thus, to the state of mind element of "awareness" discussed in part A above, the emphasized phrase adds an objective element by resorting to the "reasonable person" standard. This objective element, however, is further complicated by the phrase "to assume."

■ In the paradigm context for the law's use of the "reasonable person" standard, no "assum[ptions]" are in order. The "reasonable person" always acts with caution and care, on the basis of a reasonable assessment of the circumstances, including what is known and what is unknown. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 32 at 175 (5th ed. 1984). The classic "reasonable person" does not "assume" one thing or another about the un-

known; instead, the "reasonable person" treats the unknown as unknown and chooses a course of action that is reasonable when one must act before it is possible to learn what one might wish to know but does not know.

The phrase "would cause a reasonable person to assume" can not reasonably be understood to mean "cause a reasonable person to *believe with substantial certainty,*" the tort-law formulation closest to "know." For this reason alone, I reject FDIC's contention that "discovery" cannot be shown without proof of *knowledge* of a specific fraudulent act.

For present purposes, İ assume without deciding, as FDIC asserts, that "mere suspicion" of loss is not sufficient to constitute "discovery." *See American Surety Co. v. Pauly (No. 1),* 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977 (1898); *Mid–America Bank of Chaska v. American Casualty Co.,* 745 F.Supp. 1480 (D.Minn.1990). That rule does not apply, however, to a suspicion that is coupled with awareness of information that, in the mind of an ordinarily prudent person, would create more than a "mere suspicion." When an answer for the unknown cannot be obtained before it is necessary to take action, an ordinarily prudent person may choose to act on the "assum[ption]" that a loss *has occurred* rather than on an assumption to the contrary. If an ordinarily prudent person would respond in this way to the need to make a hard choice that has to be made on incomplete information, the ordinarily prudent person would then be "assum[ing]" that loss has occurred. Thus, "discovery," as that concept is defined in the Bond, would have occurred.

This interpretation of "assume" is reinforced by the fact that "assume" applies to a loss that "has been *or will be incurred.*" Common sense tells us that "knowledge," or even "belief with reasonable certainty," would rarely if ever exist as to a loss that "will be incurred" at some time in the future.

FDIC argues that "discovery" in the sense defined by the Bond occurred on December 18, 1989. Thus, FDIC concedes that under the *Mid–America Bank of Chaska* standard, more than "mere suspicion" existed and "dis-

covery" had occurred by that date. I conclude, however, as explained in Part V, that responsible officers of the Bank were more than "merely suspicious" of DiCologero and Bonaiuto more than a month before December 18, 1989. In November of 1989, they had enough information about possible wrongdoing that they had taken the significant and unusual action of commissioning an outside firm to investigate the matter. They had "discover[ed]" the loss.

C. *"a loss of a type covered by this bond has been or will be incurred, regardless of when the acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known."*

In the above parts A and B, I concluded that the term "discovery" in the Bond requires the insured to have awareness of facts that would cause an ordinarily prudent person to "assume" that a loss of some kind had occurred. The interpretation of the contract language can not end there, however, because the term "loss," itself, must be explained.

As stated in Part I, the loss at issue in this case is allegedly insured under the "Fidelity" provisions of the Bond. FDIC, as the Plaintiff in this action, would have the burden of proving "loss" at trial, were the case to proceed that far. Included in this burden would be the burden of proving that a loss was caused by fraudulent acts of an employee and that the alleged fraudulent acts were committed with the manifest intent of the employee "(a) to cause [the Bank] to sustain such loss, and (b) to obtain financial benefit for the Employee or another person or entity." Moreover, because the loss in this case was the result of loans, the FDIC would also have to prove that "the employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500."

Thus, if this case were to proceed further, the FDIC would have to prove multiple elements regarding the intent of the employees and the amount of financial benefit they received in return for their fraudulent acts.

The level of proof required to prevail on the ultimate question of coverage under the Bond is by a preponderance of the evidence. Thus, the degree of probability of loss that would need to be proved at trial is materially different from, and greater than, the degree of probability of loss involved in the "discovery" provision of the Bond.

The language of the Bond defining "discovery" makes clear that "discovery" occurs "even though the exact amount or details of loss may not then be known." I conclude, therefore, that representatives of the Bank did not have to know the actual state of mind of the employees or the exact amount of benefit those employees received in order for the Bank officials' level of awareness to constitute "discovery" of the loss. It would be sufficient to constitute "discovery" that Bank officials had information regarding the nature of the fraud involved, the identity of at least some of the employees who were involved, and the benefit allegedly received by those employees in return for their fraud.

In any event, as explained in Part V below, the undisputed evidence on the record shows that in October, agents of the Bank knew that DiCologero's husband had purchased a Rostoff condominium without paying the $7,700 deposit listed in the loan documentation. Thus, it is undisputed that representatives of the Bank had enough information for hypothetical "reasonable persons" in their position to "assume" that DiCologero, at least, had received a benefit in excess of $2,500.

V

In its brief, INA argues that the Bank "discovered" the loss through a series of events and documents that date as early as March 7, 1989. Although each event or document taken individually might not amount to discovery, INA argues that the series as a whole provided the Bank with discovery of the loss, as defined in the Bond, before December 16, 1989. In determining whether the evidence proves "discovery" beyond a genuine dispute, I need not consider whether a single particular event or document alone demonstrates discovery beyond the possibility of genuine dispute. It is sufficient, for the

purposes of ruling on the motion for summary judgment, if the combination of undisputed historical events shows that no other reasonable inference than "discovery" before December 16, 1989 is possible.

The series of events and documents upon which INA relies primarily involve disputes and litigation between the Bank and purchasers of condominiums from the Rostoff Group. Often, this information came to the Bank through lawsuits against the Bank, or counterclaims against the Bank when the Bank initiated foreclosure proceedings against defaulting borrowers.

INA calls attention to the verified complaints and verified counterclaims of two sets of borrowers: Herbert and Deanna Bello, and Edward and Dorothy Giamette. Both of these complaints and the counterclaims were received by the Bank in September of 1989. Moreover, it is significant that when the Bank finally sent INA a Notice of Loss on January 16, 1990, it included, as the *only* documentation of the loss, the Giamette verified complaint and verified counterclaim.

In this verified complaint and verified counterclaim, allegations were made that implicated both DiCologero and Bonaiuto. Specifically, the verified counterclaim alleged:

1. Giamette told Bonaiuto that the loan documentation was false, and Bonaiuto told him that the Bank knew that the loan documentation was false. (paragraph 27 of the counterclaim)

2. Marc DiCologero provided appraisals to support the values of the condominiums listed on the loan documents, and Marc DiCologero was paid for this service. (paragraph 41 of the counterclaim)

Moreover, both the complaint and counterclaim allege that DiCologero, Bonaiuto, the Rostoff Group, and the Bank conspired to defraud the Giamettes.

Another source of evidence of discovery to which INA calls attention is DiCologero herself. Phillip Gillette, a Vice President of the Bank, has testified that DiCologero told him in October that her husband had purchased a condominium from the Rostoff Group without making any down payment. Gillette testified

that this admission caused the Bank to conduct an internal investigation. A special meeting of the Bank's Audit Committee was called on November 6, 1989, and the Bank decided to hire the law firm of Gaston & Snow to investigate the situation.

Gaston & Snow then prepared a "Proposed Scope of Investigation" dated November 15, 1989. This document indisputably shows that by at least November 15, the Bank had decided to take action. In these circumstances, it is beyond genuine dispute that at this time, if not before, Bank officials "assumed" that the Bank had suffered a loss under the Bond. The conclusion that no contrary inference could reasonably be drawn by a finder of fact is reinforced by the fact that the proposal by Gaston & Snow reveals that, at the very least, the Bank had information regarding:

1. Possible violations of federal or state banking laws through the 100% financing of condominium purchases.

2. The possibility that the above violations were the intentional acts of Bank employees who may have received compensation in return.

3. Specifically, that DiCologero, her son and her husband had received compensation from outside sources.

4. The possibility that the Bank's counsel in the loan closings was involved or had information about the events.

Gaston & Snow also proposed to hire a private investigator to investigate DiCologero, her husband, and her son. The Bank agreed to the full proposal, which estimated the cost of Gaston & Snow's investigation at $25,000.

The Bank argues that when it engaged the law firm to conduct the investigation, it only had a "mere suspicion" of wrongdoing. This contention lacks merit. The suggestion that the hypothetical "reasonable person" in the position of a bank officer commits $25,000 of the bank's resources to such an investigation on a "mere suspicion" is contrary to common sense.

I conclude that reasonable finders of fact could not differ on this matter; it is indisputable that by November 15, 1989, the Bank had "assume[d]" that a loss had occurred.

Thus, it had an obligation to give notice to INA "at the earliest practicable moment," but in any event, no later than December 15, 1989. The Bank did not give notice to INA until January 16, 1990. Its notice was untimely.

## VI

The conclusion reached in Part V reflects the application of a bright-line rule that is well-supported on grounds of fairness and public policy, as well as established precedent. Moreover, the circumstances of this case, in particular, warrant the application of this bright-line rule.

At the time the Bank initiated its outside investigation, it had a contractual obligation to inform INA of the discovered loss, if the Bank wished to preserve its rights to assert a claim for coverage under the Bond. One purpose of the notice requirement is to allow the insurer to conduct its own investigation, so it does not have to rely purely on information from the insured. *See Chas T. Main, Inc. v. Fireman's Fund Ins. Co.*, 406 Mass. 862, 551 N.E.2d 28, 29 (1990).

By first conducting its own investigation before informing INA, the Bank potentially prejudiced INA both by the risks of corrupting evidence and by knowingly causing delays that would allow memories to fade. By waiting until its own investigation was completed before informing INA, the Bank denied INA the prompt and unimpaired access to evidence for which it had contracted. The parties had an agreement, and the Bank chose to take its own course of action, preferring its own self-interest over that of the insurer, rather than to give timely notice in accordance with the contract.

My conclusion in this case is also reinforced by the fact that the Bank further delayed reporting to INA even after it claims it "discovered" the loss. The Bank claims that discovery occurred when Gaston & Snow delivered its report to the Audit Committee on December 18, 1989. Three days later, on December 21, 1989, the Board of Directors authorized the President of the Bank to terminate DiCologero, report the situation to the FDIC, the FBI and the Massachusetts Commissioner of Banks, and to give notice to INA of the loss.

On December 26, 1989, DiCologero resigned after being told she would otherwise be terminated. On December 27, 1989, the Bank reported the situation to the FBI. The Bank waited, however, until January 16, 1990 to give Notice of Loss to INA.

The notice requirement in the Bond requires Notice of Loss to be sent to INA "at the earliest practicable moment, not to exceed 30 days...." The Bank, seems to have ignored the first part of this contractual phrase and treated the condition as a simple 30-day limit. Even under the Bank's claim that it discovered the loss on December 18, 1989, it still waited almost the full 30-day period before giving notice. Moreover, the additional delay was not used to improve in any way the package of information supplied to INA. The only documentation provided to INA on January 16, 1990 was the Giamette verified complaint and counterclaim, which the Bank had received in September. The FDIC has not offered any reason for this additional delay.

For the above reasons, I conclude that it cannot be genuinely disputed that the Bank had discovered the loss by November 15, 1989 at the latest. Notice of loss, therefore, having been delivered on January 16, 1990, was untimely.

I need not address other timeliness issues raised in INA's motion.

FDIC is barred from proceeding with this action because Notice of Loss was not properly given to INA. The motion for summary judgment will be allowed.

## ORDER

For the foregoing reasons, it is ORDERED:

(1) Defendant's Motion for Summary Judgment (Docket No. 19, filed August 15, 1995) is ALLOWED.

(2) The Clerk is directed to enter forthwith on a separate document a Final Judgment as follows:

(1) Judgment for Defendant, Insurance Company of North America, with costs.

64

(2) The Third–Party Claim of Insurance Company of North America against Paul J. Bonaiuto and Delores DiCologero is dismissed as moot.