**COMMUNITY SAVINGS BANK, Plaintiff,**

v.

**FEDERAL INSURANCE COMPANY, Defendant.**

**Civil No. 3:94–02102 (DJS).**

United States District Court, D. Connecticut.

March 25, 1997.

17

Mark V. Connolly, Kent D.B. Sinclair, Tyler Cooper & Alcorn, Hartford, CT, for plaintiff.

Jerome D. Elbaum, Blume, Elbaum & Collins, West Hartford, CT, Alan Robert Baker, Dominic Fulco, III, William J. O'Sullivan, Baker & Fulco, Wethersfield, CT, for defendant.

## MEMORANDUM OPINION AND ORDER

SQUATRITO, District Judge.

The plaintiff in this action, Community Savings Bank ("CSB"), alleges that the defendant, Federal Insurance Company ("Federal"), breached its insurance contract, specifically a Financial Institution Bond Form A, and also breached an implied covenant of good faith and fair dealing. The defendant has moved for summary judgment claiming, among other things, that the plaintiff's losses are not covered under the parties' contract, and even if these losses would be covered, they are excluded under the contract because CSB had knowledge that its employee was engaged in insider trading and other wrongful acts, and CSB failed to provide Federal with timely notice of the losses. For the reasons stated below, the defendant's motion for summary judgment is granted.

### BACKGROUND

#### A. Insurance Contract

In June 1992, CSB contracted with Federal through its agent, Chubb & Son, Inc., to obtain certain insurance coverage which Federal provided by means of a Financial Institution Bond Form A, Bond Number 81227513–D, ("the Bond"). (Pl.'s Stmt. Material Facts ("Pl.'s Facts"), ¶ 1.) The Bond provided coverage from July 1, 1992, through June 30, 1993, in the aggregate amount of $1,000,000, subject to a deductible of $100,000. (Def.'s Stmt. Material Facts ("Def.'s Facts"), ¶ 2.) The Bond consists of different insuring clauses that protect against certain crime risks to financial institutions. (Def.'s Facts, Ex. 1.) All of these insuring clauses are subject to a common set of: agreements;

definitions; exclusions; conditions; and limitations. (Def.'s Facts, Ex. 1.)

## B. CSB's Dishonest Employee

From the time CSB initially was incorporated in 1984, until August 1992, Robert F. Festa ("Festa") was employed as President and Chief Executive Officer of CSB. (Pl.'s Mem. Opp'n. Def.'s Mot. Summ. J., ¶ 1.) Festa allegedly violated CSB's Conflict of Interest Policies (Pl.'s Facts, Ex. S), Code of Ethics (Pl.'s Facts, Ex. T), and Loan Policies. Additionally, the Federal Reserve Board found that Festa violated Regulation O, of the Code of Federal Regulations, by: "making loans on his own authority or presenting loans to the CSB Board and voting on them when Festa had an undisclosed equity interest and business relationship with either the corporate or individual borrowers, and Festa [an executive officer] stood to benefit financially from the proceeds of the loan." (Pl.'s Facts ¶¶ 9, 22.) *See also* 12 C.F.R. § 215.20. In August 1992, based on Festa's misrepresentations and dishonest acts, CSB demanded that Festa resign as its President and Chief Executive Officer. (Pl.'s Facts ¶¶ 5, 8.) On or about October 1995, Festa plead guilty to deceiving a federally-insured banking institution, in violation of 18 U.S.C. § 1005, with respect to the CSB loans. (Pl.'s Facts, Ex. L.)

CSB alleges that Festa's dishonest conduct caused CSB to incur losses with respect to nine loans ("loan losses"), called "categories of specific loss" under the Bond, and that each of these loan losses is covered under the Bond. The first of the nine loan losses relates to a $300,000 loan to MFS Associates, Inc. ("MFS"), dated June 24, 1988. (*See* Pl.'s Facts at 3–5.) The discovery and notice issues related to this first loan loss, the MFS loan, also apply to the eight subsequent loan losses, and if this MFS loan loss is excluded from coverage, then the eight subsequent loan losses also are excluded under the same principles. Therefore, the Court needs only to address fully this first loan loss, as discussed below. (*See* Def.'s Facts, Ex. 2.)

## C. MFS Loan

The MFS loan demonstrates the first instance of Festa's dishonesty related to CSB's claimed loan losses under the Bond. This loan from CSB, dated June 24, 1988, in the amount of $300,000, was to MFS and also Nicholas F. Marien ("Marien"), in Marien's individual capacity. (Pl.'s Facts ¶ 8.) Although this loan was presented as a first mortgage/construction loan, it was in fact, a second mortgage secured on premises known as 1082–1088 Farmington Avenue, Bristol, Connecticut. (Pa.'s Facts, Ex. 2.) At the time of the MFS loan, Festa and Marien had equity interests in both CSB and MFS. Festa was President and Chief Executive Officer of CSB and a shareholder of MFS; Marien was acting legal counsel to CSB and the President, and a shareholder, of MFS. (Pl.'s Facts ¶ 17; Def.'s Facts, ¶ 5.)

CSB asserts that, when the MFS loan was presented to CSB's loan committee and Board of Directors in March and April 1988, CSB relied upon Festa's misrepresentations when it approved the loan. (Pl.'s Facts, ¶ 21.) The facts show that Festa: (1) failed to disclose his equity interest in MFS, although he was obligated to do so under federal banking law (Pl.'s Facts, ¶ 31); and (2) improperly did not abstain from voting on this insider loan from which he benefitted. (Def.'s Facts, Ex. 2.)

According to Marien's testimony, CSB's $300,000 loan to MFS in 1988, was used in part to "buy out" Festa's interests in MFS. (Pa.'s Facts ¶ 39, Ex. R.) On June 24, 1988, Festa executed an Assumption and Indemnity Agreement whereby Festa, as seller, would terminate all of his rights, benefits and stock ownership in MFS. (Pl.'s Facts, Ex. V.) In January 1989, Festa purportedly executed a guaranty agreement whereby Festa, upon Marien's insistence, agreed to guarantee personally the MFS loan (Pl.'s Facts, Ex. A), but Festa never placed a copy of that guarantee in the MFS loan file at CSB. (Pl.'s Facts, ¶ 25.)

In July 1990, the FDIC examined CSB, and "adversely classified" the $300,000 MFS loan. The FDIC listed its reasons for deeming the MFS loan to be a higher financial risk, including the fact that CSB lacked necessary MFS financial statements. (Pl.'s Facts, ¶ 27; Def.'s Facts, Ex. 2.) In early

July 1990, CSB placed the MFS loan on an amortization schedule, which extended for one year the maturity date of the note, thereby reducing the amount of MFS's monthly mortgage payments. (Pl.'s Facts, Ex. I.) The minutes of a special meeting of the Board of Directors, on August 22, 1990, reveal that CSB knew that Festa had violated its banking policies. (Def.'s Facts, Ex. 6.) Also, in 1991, CSB issued a Proxy Statement stating that Festa was a partner in MFS, again showing that CSB knew of Festa's insider trading. (Def.'s Facts, Ex. 9.)

In August 1992, the FDIC for a second time examined the $300,000 MFS loan, this time focusing on Festa's involvement in, and the inappropriate documentation and excessive encumbrances of, the MFS loan. (Pl.'s Facts, Ex. J.) At this point, CSB also conducted its own internal investigation.

### D. CSB Asserts Claim

In September 1992, CSB notified the defendant Federal in writing that CSB anticipated making a claim for coverage under the Bond. On January 20, 1994, CSB filed with Federal, as the Bond required, a preliminary Proof of Loss. (Def.'s Facts, Ex. 2.) In the Proof of Loss, CSB asserted a claim for the nine loan losses related to Festa's dishonest acts, totaling $1,018,896.80, minus a $100,000 deductible. (Pl.'s Facts at 2, Ex. 2.) CSB's Proof of Loss was an extensive investigation conducted by outside legal counsel, Tyler, Cooper & Alcorn, which identified those persons or parties whose conduct, in collusion with Festa, caused or contributed to the substantial dollar loss to CSB, and sought to explain how these losses occurred. (Pl.'s Facts, Ex. 2.) After receiving the Proof of Loss claim, Federal conducted its own investigation, and thereafter denied CSB's claim. Subsequently, CSB brought this civil suit against Federal to collect on the claim; now, Federal moves for summary judgment.

### STANDARD

A motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The Court determines which facts are material to a particular claim based on the substantive law upon which that claim rests. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute regarding a material fact is genuine if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

In determining whether there is a genuine issue as to any material fact, the Court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving *party. Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Gallo,* 22 F.3d at 1223; *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

On a motion for summary judgment the Court cannot try issues of fact; it can only determine whether there are issues to be tried. *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. The function of the Court at this stage is not to weigh the evidence and determine what is true, but rather to "pierce the pleadings and to assess the proof" in order to see whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

### DISCUSSION

■ The defendant argues that first, CSB's losses are not covered under the Bond, and second, even if the Bond otherwise would have covered these losses, CSB's claimed losses are excluded from coverage.

As to the defendant's first claim, drawing all inferences in favor of the non-moving plaintiff leads this Court to conclude that CSB's claimed losses ordinarily would be covered under the Bond. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14 (requiring Court to draw all inferences in favor of non-moving party when deciding summary judgment motions). As to the defendant's second claim, however, even when drawing all inferences in favor of CSB, *Id.,* this Court concludes that coverage under the Bond is excluded in this case, for all nine loan loss which CSB claims, for the reasons stated below.

## A. Exclusions from Coverage

The Bond excludes coverage under its Insuring Clause if any one of the following three sections apply: (1) under Section 12aa., coverage terminates as to the acts of that employee immediately upon the insured's learning of the dishonest acts of that employee; (2) under Section 6a., there is untimely notice of the loss; or (3) under Section 5a., the discovery of loss occurs before the Bond period begins. (Def.'s Facts, Ex. 1.) Because the Court finds that the Bond coverage is excluded under Sections 12aa. and 6a., the Court need not address the other merits of the case under Section 5a.

### 1. Exclusions from Coverage Under 12aa.

▮ A fidelity bond provision for terminating or canceling coverage as to any employee upon the insured's discovery of dishonesty or fraudulent acts of the employee is valid. *Fidelity & Casualty Co. of New York v. Central Bank of Houston,* 672 S.W.2d 641 (Tex.App. 1984); *Cent. Progressive Bank v. Fireman's Fund Ins. Co.,* 658 F.2d 377 (5th Cir.1981); *see also Ritchie Grocer Co. v. Aetna Casualty & Surety Co.,* 426 F.2d 499 (8th Cir.1970) (stating insurer may rely on bond termination defense).

▮ In this action, Section 12aa. of the Bond provides that coverage terminates as to an employee:

[i]mmediately on the ASSURED, or any of its directors, trustees or officers not acting in collusion with such Employee, learning of any dishonest act committed by such Employee at any time, whether in the employment of the ASSURED or otherwise, whether or not such act is of the type covered under this bond, and whether against the ASSURED or any other person or entity.

(Def.'s Facts, Ex. 1.)

Here, the record reveals that by August 22, 1990, certain CSB directors who were not acting in collusion with Festa learned of Festa's dishonest acts with respect to the MFS loan at a special meeting of the Board of Directors. (Def.'s Facts, Ex. 6.) At this time, CSB knew that Festa acted dishonestly and violated banking rules with respect to the MFS loan. *See* 12 C.F.R. § 215.20. Also, CSB admits that it knew that Festa had a beneficial interest in MFS when the Loan Committee approved the amortization schedule at the September 5, 1990, Loan Committee meeting. (Def.'s Facts, Ex. 4, ¶ 62.) Supporting this evidence, John Baldelli, one of CSB's board members, testified in his deposition that CSB knew, in 1990, that Festa was involved with MFS but "the loan was performing so the bank did not take action." (Def.'s Facts, ¶¶ 8, 10, 14; Baldelli Tr. at 113.)

After resolving all ambiguities and drawing all factual inferences in favor of the plaintiff, *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Gallo,* 22 F.3d at 1223; *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989), this Court concludes that the plaintiff learned, on August 22, 1990, of Festa's dishonest acts regarding the loans, thereby automatically terminating coverage under the Bond as to CSB's employee, Festa, from that point forward.

### 2. Exclusions from Coverage Under 6a.

▮ Coverage also is excluded under the bond with respect to all nine loan losses because CSB failed to provide Federal with proper and timely notice of the loan losses, as Section 6a of the Bond requires.

▮ Prompt notice permits the insurer to immediately protect its rights and interests by allowing it to investigate, minimize and possibly recoup purported losses. *Utica*

*Mutual Ins. Co. v. Fireman's Fund Ins. Cos.,* 748 F.2d 118, 121 (2d Cir.1984). The timely giving of notice and filing of a proof of loss are conditions precedent to coverage, and the insured's failure to comply with notice provisions is a complete defense to a bond claim. *See, e.g., Utica Mutual Ins. Co.,* 748 F.2d at 118; *Adair State Bank v. Am. Casualty Co.,* 949 F.2d 1067 (10th Cir.1991). The insurer need not demonstrate that it was prejudiced in order for late notice or a late proof of loss to constitute a defense to coverage. *Utica Mutual Ins. Co.,* 748 F.2d 118 (2d Cir.1984); *Fed. Deposit Ins. Corp. v. Ins. Co. of N. Am.,* 928 F.Supp. 54 (D.Mass.1996) (granting summary judgment because bank's notice was untimely).

■ Section 6a. of the Bond requires that the insured shall provide the insurer with notice of loss at the earliest practicable moment, not to exceed thirty days after discovery of the loss. (Def.'s Facts, Ex. 1.)

Discovery of the loss, defined in section 5a. of the Bond, occurs:

> at the earlier of the ASSURED being aware of: (a.) facts which may subsequently result in a loss of a type covered by this bond ... regardless of when the act or acts causing or contributing to such loss occurred, even though ... the exact amount or details of loss may not then be known.

(Def.'s Facts, Ex. 1.)

Even after resolving all ambiguities and drawing all factual inferences in favor of the plaintiff, this Court finds that CSB actually was aware of facts constituting "discovery" on August 22, 1990, and thus was obligated under Section 6a. of the Bond to notify Federal at that time, or within thirty days of discovery. (Def.'s Facts, Ex. 6). However, because CSB waited more than two years, until September 1992, to provide written notice to Federal, this notice was untimely under Section 6a. of the Bond.

## B. Breach of Covenant of Good Faith

The plaintiff concedes that absent a meritorious claim under the Bond, Federal did not act in bad faith. (Pl.'s Opp'n. Def.'s Mot. Summ. J., ¶ 29.) Therefore, because CSB lacks a meritorious claim under the Bond, this Court finds that Federal did not breach its implied covenant of good faith and fair dealing.

### CONCLUSION

Because there exists no genuine issue of material fact regarding the conclusion that Festa's dishonest acts are excluded from coverage under the Bond, the defendant Federal's motion for summary judgment **(Docket No. 14)** is **GRANTED.** Accordingly, the clerk is to **CLOSE THIS CASE,** and no further action may be taken in this matter, except for the right to appeal, which must be made within **30 DAYS** of the date of this judgment.

It is so ordered.