**FEDERAL DEPOSIT INSURANCE CORPORATION, Receiver for Heritage Bank for Savings,**

v.

**UNDERWRITERS OF LLOYD'S OF LONDON FIDELITY BOND NUMBER 834/FB9010020, Syndicate Numbers 210, 839, 1067, 565 456, 204, 490, 1048, 1163, 624, 896, 638, 1053, 1145, 702, 113, 357, 323, 316, 989/279/650, 257, Generali Insurance Company.**

No. CIV.A. 95–CV–30061–MAP.

United States District Court,
D. Massachusetts.

April 17, 1998.

---

Julian S. Greenspun, Storch & Brenner, Washington, DC, Leila R. Kern, Kern, Hagerty, Roach & Carpenter, Boston, MA, for Plaintiffs.

William T. Bogaert, Andrew F. Caplan, Morrison, Mahoney & Miller, Boston, MA, for Defendants.

### MEMORANDUM REGARDING CROSS–MOTIONS FOR SUMMARY JUDG–MENT (Docket Nos. 40, 46)

PONSOR, District Judge.

## I. INTRODUCTION

The Federal Deposit Insurance Corporation ("FDIC") brings this action against certain underwriters of Lloyd's of London ("Underwriters") who subscribed to a banker's blanket bond issued in 1990 by Lloyd's to the now-defunct Heritage Bank for Savings ("Heritage"). Specifically, defendants are those underwriters and the Generali Insurance Company who subscribed to Bond No. 834/FB9010020 issued to Heritage for the bond period of September 1, 1990 to September 1, 1991.

Plaintiff, FDIC, acting in its receivership capacity for Heritage, seeks to recover more than $15 million in losses allegedly covered under the fidelity provisions of the blanket bond. The FDIC claims that these losses are attributable to the fraudulent and dishonest acts of former Heritage Senior Vice President Michael Smith (Smith), who pled guilty to federal bank fraud and bribery charges in 1994.

Defendants have moved for summary judgment on four separate grounds. First, defendants contend that they are entitled to rescission of the bond under Mass. Gen. Laws ch. 175, § 186, because Heritage made material misrepresentations in response to certain questions on its 1990 bond application.

Second, defendants argue that Smith was never covered under the bond, because the "Cancellation or Termination" provision of the bond terminated coverage as to Smith when Heritage learned of his dishonest acts prior to the bond's inception.

Third, defendants argue that Heritage had "discovered" (as defined by the bond) the Smith losses before the bond ever took effect, and because the bond only covered losses "discovered" *during* the bond period, Her-

itage's "discovery" of the losses *prior* to the bond period defeats plaintiff's claim for recovery.

Finally, defendants submit that, even if Heritage discovered the Smith losses *during* the 1990–91 bond period, plaintiff's claim is barred because Heritage failed to provide timely notice of their claim to defendants.

Plaintiff, FDIC, filed a consolidated cross motion for summary judgment seeking dismissal of defendants' misrepresentation defenses, and seeking judgment in its favor on the discovery and notice issues. The court has jurisdiction under 12 U.S.C. § 1819(b) and 28 U.S.C. §§ 1331 and 1345.

This case has moved though the court accompanied by a series of criminal cases, the last of which recently received its final disposition. By intention, the court has waited to address this civil action until now. After painstaking review of the parties' memoranda and the thousands of pages of exhibits, transcripts, and affidavits submitted in this case, the court is constrained to conclude that, on the *undisputed* facts of record, the defendants are entitled to rescission of the 1990 bond under Mass. Gen. Laws ch. 175, § 186, due to the material misrepresentations made by Heritage in its application for the bond.

The uncontested evidence compelling this conclusion will be set out at length below. To cite, by way of example, the most flagrant instance of misrepresentation, Heritage bank officials confronted the following question on the 1990 bond application: "Please state in detail, any irregularities in banking or financial operations ... known to the Bank during the past 3 years." To this question the bank officials answered: "None."

Heritage gave this answer in August 1990 despite being aware of the serious misconduct of two recently-discharged loan officers of the bank, including the unapproved extension of hundreds of thousands of dollars in credit over loan amounts, advances in excess of the officers' lending authority, camouflaged "straw" loans to borrowers via third-party proxies, and egregious deficiencies in loan documentation. Moreover, the bank had conducted internal audits on both officers' portfolios and had retained a law firm to investigate rumors that one of the officers appeared to have acquired possessions and property incommensurate with his salary at the bank. Finally, an FDIC examiner had filed a Report of Apparent Crime on one of the officers in June 1990, a few months before Heritage completed the bond application.

Under these circumstances, to answer "None" to the posed question is analogous to submitting an application for fire insurance without telling the carrier that the kitchen is already in flames. The bank's conduct may be explained perhaps by a desire to conceal the fact that one prominent cause of the bank's precarious financial position was the misconduct and ineptitude of the bank officials themselves, and by the bank's determination to obtain necessary insurance coverage by any means.

These misrepresentations would alone suffice to make the 1990 bond voidable. In addition, however, the facts of record establish that Heritage "discovered" the losses caused by Smith (as the law defines that term) well outside the 30–day notice period set by the bond. The bank's failure to give defendants timely notice of the discovered losses constitutes an independent and equally unavoidable ground for allowing defendants' motion. Because these two bases for summary judgment emerge so clearly from the record, it is unnecessary for the court to address defendants' other arguments.

The effect of the court's ruling is distasteful. Because of the misrepresentations made in the policy application and the failure of the bank's officials to give timely notice to the insurer, insurance coverage for some fifteen million dollars of loss to the bank, and perhaps more, will be forfeited. In short, this source of reimbursement to the FDIC, and presumably to the American taxpayer, will be lost. Unfortunately, the actions of Heritage officials require this result, as a more detailed review of the record will demonstrate.

## II.  FACTUAL BACKGROUND

The facts giving rise to this bond claim are enmeshed in a much larger web of events

that led to the demise of the Heritage Bank for Savings, a lending institution with roots in western Massachusetts going back 150 years. The narrative of that collapse presents a chronicle of naivete, greed, and misplaced trust—a tale that reached its climax in the betrayal of the bank's investors and the larger community. Having now sentenced several individuals who pled guilty to bank fraud and bribery charges in connection with the criminal side of this story, and having presided over the jury trial of a former Heritage attorney who was ultimately acquitted of similar charges, the court is acutely aware of the backdrop against which this multimillion dollar bond claim rises. However, in deciding this case, the court emphasizes that it has based its conclusions solely upon the facts presented in the record *in this case*, and has in no way drawn upon independent knowledge of circumstances not directly part of this record.

Even with this limitation, it has been somewhat difficult to construct a comprehensive linear narrative of the events giving rise to this bond claim. This is due to the enormous volume of exhibits submitted by the parties and the fact that the story's various subplots are interwoven, with several key events occurring almost simultaneously.

With all this in mind, the critical task for the court in this case has been to distill from the record the undisputed material facts concerning what Heritage knew about the activities of Smith, both at the time Heritage applied for bond coverage with defendants in August 1990, and in the subsequent months leading up to August 30, 1991, when Heritage first provided notice to defendants of a bond claim on Smith. As it turns out, there is no genuine dispute about what information was known to Heritage; rather, the disagreement centers on the parties' characterization of the factual record, the inferences and conclusions

that properly may be drawn from this record, and the application of the law to the facts of this case.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing defendants' Motion for Summary Judgment, the court views the evidence in the light most favorable to the plaintiff.[1]

## A. THE HISTORY OF HERITAGE BANK FOR SAVINGS[2]

Heritage Bank for Savings was a state-chartered savings bank headquartered in Holyoke, Massachusetts. Founded in 1842 as the Amherst Savings Bank, the institution evolved through a series of mergers with small community banks in western Massachusetts, including the Franklin Savings Institution in 1982 and the Northampton Institute for Savings in 1986, and culminated in the acquisition of Community Savings Bank in 1988.[3]

In 1987, a holding company for Heritage was formed, named Heritage Bancorp, Inc. ("Bancorp"), which issued shares of publicly traded stock. Heritage became a wholly-owned subsidiary of Bancorp in 1988. The principal business of Bancorp, through Heritage, was attracting deposits and investing them in real estate mortgages, in commercial and consumer loans, and in various investment securities.

By 1989, Heritage was the second largest stock savings bank in Massachusetts, with 29 banking offices throughout Hampshire, Hampden, Franklin, and Worcester Counties, and assets of nearly $1.7 billion.

---

1. Where the parties' exhibits overlap, the court has cited to the plaintiff's version of the exhibit. Depositions are referred to by the name of the deponent, regardless of which party submitted the excerpt.

2. The history of Heritage is taken largely from plaintiff's Exhibit 83 (Heritage's 1989 Annual Report), at Bates A & A 100577.

3. The Community Savings Bank itself was the product of mergers between Mechanics Savings Bank of Holyoke and Chicopee Falls Savings Bank in 1967, and later, between the resulting Falls Mechanics Savings Bank—renamed Community Savings Bank in 1969—and Holyoke Co-operative Bank and Springfield Five Cent Savings Bank in 1971.

When the local economy deteriorated in the late 1980s, Heritage began to suffer enormous losses, largely on commercial loans that defaulted. These losses reached $27 million in 1989, $28 million in 1990, and $57 million in 1991. Ultimately, in December 1992, as losses continued to mount, the Massachusetts Commissioner of Banks declared Heritage insolvent and closed the bank, at which time the FDIC was appointed receiver.

## B. MICHAEL SMITH

### 1. Plaintiff's Claim

Plaintiff, FDIC, seeks to recover for losses allegedly sustained due to the dishonesty of Michael Smith, Heritage's former senior vice president in charge of commercial lending. FDIC claims that Smith, with the intent to receive financial benefits, and having indirectly received such benefits, extended loans to his former college roommate Ira Sutton, and Sutton's various corporate entities; colleagues and family members, including Patrick Goggins, Arthur Pichette, Peter Whalen, Irving Labovitz, David Shrair, Valley Design and Development, Inc., Goggins & Whalen Real Estate Agency, Inc., Donald Todrin, Armand Duseau and some of Duseau's corporate entities; Steven and David Rostoff and some of their corporate entities and colleagues; and Jeffrey Anderson and his company, G & H Leasing, Inc. The FDIC asserts that the losses caused by Smith's misconduct exceeded $30 million as of the time it filed suit in 1995.

### 2. Michael Smith's Employment at Heritage

Smith was a Northampton native who started working at Heritage (then the Northampton Institute for Savings) in 1982. He started as a teller but became a commercial lending officer shortly thereafter. A lifelong resident, he was highly regarded in the Northampton community.

Until 1986, Heritage was primarily a residential mortgage and consumer loan savings bank with a small commercial loan department. However, in 1986 Heritage began substantially increasing deposits. Smith became chief commercial lending officer at Heritage/NIS that year, and, having been granted considerable autonomy by Heritage president and CEO Richard Covell, Smith began to contribute greatly to the bank's growth through the aggressive expansion of commercial loans. Covell, who was a family friend of Smith, had never been a commercial loan officer himself, and he relied heavily on Smith's judgment. Covell Dep. vol. II at 115.

When Heritage acquired Community Savings Bank ("Community") in 1988, John Fridlington, who arrived with Community, became the executive vice president of commercial lending, a position senior to Smith. Covell and Fridlington knew that Smith resented being passed over for Fridlington's position, and that his lending philosophy clashed with that of his more conservative supervisor. Covell Dep. vol. II at 100–02; Fridlington Dep. vol. I at 23–25.

### 3. Cummington Farms; Heritage's Internal Audit

Serious concerns with Smith's loan activity began to surface in early 1989. In January 1989, Heritage's chief financial officer, George Dimitrio, found that between $900,-000 and $1 million had been overadvanced on a $2 million real estate development loan known as the Cummington Farms project, one of Smith's loans.[4] Fridlington Dep. vol. I at 38–39, 128–30. An "overadvance" is an unapproved extension of credit—that is, an advance over the approved loan amount.

Heritage's management group wanted to know if there were any other overadvances by Smith they had not been informed of and asked the bank's vice president and director of internal auditing, Grant Jamieson, to conduct an internal review of such incidents. *Id.* at 126–28. Jamieson's February 1989 review uncovered a number of advances in excess of

---

4. According to Fridlington, Heritage's loan policy allowed Smith to lend up to $500,000 without Board of Directors or Loan Committee approval. Loans between $500,000 and $1 million were to be approved by the Senior Loan Committee, which Smith headed at that time. For loans over $1 million, the policy required Executive Committee or Board approval. Fridlington Dep. vol. I at 27–28.

approved loan commitments or in excess of Smith's lending authority, including loans to his former college roommate, Ira Sutton; the Rostoffs; Duseau Waste Industries; Cummington Farms; and Arthur Pichette. Fridlington Dep. vol. II at 16–20. Jamieson's review prompted a meeting in March 1989 between Heritage's management and Smith. Smith apparently acknowledged his poor record keeping and attempted to rationalize the overadvances as decisions he believed were made in the best interests of the bank. Management determined that Smith had exceeded his authority and was sloppy with his paperwork. Fridlington felt that the Cummington Farms overadvance was sufficient cause for terminating Smith, but Covell apparently disagreed. *Id.* at 21–22, 26–27, 116. Smith stayed on at Heritage for the time being.

### 4. The 1989 FDIC Examination/1989 Peat Marwick Letter

In addition to Jamieson's internal audit, two other reports issued in early 1989 revealed a host of problems at Heritage. The first of these was a February 24, 1989 report jointly issued by the Massachusetts Commissioner of Banks and the FDIC ("1989 FDIC Examination"), regarding their joint examination of Heritage, a copy of which was provided to the bank. This report revealed a severe lack of internal controls at Heritage, and cited numerous significant violations of state banking statutes, FDIC regulations, and internal bank policy. Pl.'s Ex. 230. These included real estate loans without appraisals, loans granted in excess of statutory loan-to-value ratios, real estate loans not properly amortized, and numerous substantial over-advances that were not properly approved. *Id.* The report cited the bank's loan documentation deficiencies, and singled out the Sutton loans as particularly egregious examples of lending overlines, noting that Sutton had signed a promissory note for a demand line of credit of $250,000, with borrowings (as of the time of the report) totaling $1,200,000. The report also identified other Smith loans made in violation of statutes and regulations, including loans to Duseau, Goggins & Whalen, and the Rostoffs. The report stated that "[m]anagement should also

be aware that the[se] lending practices have created an ideal environment for fraud." *Id.* at Bates H023780. Covell gave the FDIC assurances that Heritage would take corrective action.

Contemporaneous with the 1989 FDIC Report, Heritage's external auditors, KPMG Peat, Marwick, Main & Company ("Peat Marwick") also conducted a review of the commercial loan department. Peat Marwick wrote to Heritage's Audit Committee on April 3, 1989 ("1989 Peat Marwick Management Letter"), pointing out several problems in the commercial lending administration, including unapproved advances made on loans over original note amounts and serious loan documentation deficiencies (including missing promissory notes, missing collateral documentation, missing appraisals, lack of evidence of committee approval, and lack of up-to-date financials on borrowers and guarantors). Pl.'s Ex. 82. The letter also noted that the "Senior Vice President of Commercial Lending [*i.e.*, Smith] had a portfolio of 743 loans totaling $188 million or 28% of the $682 million Bank portfolio." *Id.* at Bates A & A 100156.

### 5. Smith's Business Interests and Purported Assets

In the meantime, Heritage was aware that Smith had business interests with his brother-in-law, Patrick Goggins, as well as his friend Timothy Sicard, which Smith disclosed on a Lending Relationship with Executive Officers Form he had completed for Heritage. Defs.' Ex. 9. In addition, Smith had told another lending officer, Lucille Cernak, that he had a place in the Virgin Islands, and offered to rent it to her. Cernak Dep. vol. I at 63–66.

### 6. Smith's Resignation

As a result of Jamieson's internal audit, the 1989 FDIC Examination, and the 1989 Peat Marwick Management Letter, the Heritage Board held a series of meetings to discuss Smith's status. Fridlington Dep. vol. II at 31. Apparently there was some internal debate at these meetings over whether to fire Smith or ask that he resign; in any

event, the minutes from the June 28, 1989 Board Meeting reflect that the Board voted to accept Smith's resignation, effective August 1, 1989, and authorized Covell to negotiate Smith's severance agreement. Defs.' Ex. 11.

### 7. Goodwin, Procter & Hoar Investigation

In August 1989, mounting concerns about defaults on Smith's loans, as well as rumors that Smith owned condominiums in Sunapee, New Hampshire, and the Virgin Islands, led Heritage to retain the law firm of Goodwin, Procter & Hoar ("GPH") to conduct an investigation of Smith's portfolio. Fridlington Dep. vol. II at 37–38. According to GPH attorney Mark Tully, the bank instructed GPH to keep the investigation confidential out of concern for potentially damaging publicity. Tully Dep. at 13. Heritage limited the investigation to reviewing the Bank's own loan file documents and records, checking public records, and interviewing Bank personnel. GPH was instructed not to interview individuals outside the bank. Id. at 13–14. Although Tully expressed in his 1994 deposition that the purpose of the confidential review was to determine whether the Bank had a basis to file a Report of Apparent Crime with the FDIC or a bond claim on Smith, id. at 25, neither the Executive Committee meeting notes of August 16, 1989 authorizing the investigation, nor GPH's resulting November 27, 1989 memorandum ("GPH Memorandum") stated an official objective for the investigation. The GPH Memorandum noted that:

[o]ne of the driving forces behind the review of Smith's portfolio was the idea that Smith was living beyond his means, i.e., that Smith owned property in excess of what one would expect from someone earning Smith's salary. More particularly, there were rumors that Smith owned a house and a boat on lake Sunapee (or perhaps Lake Ossipee), and that Smith owned property in the Virgin Islands.

GPH Memorandum at 35, Pl.'s Ex. C.

GPH was unable to locate through public records any property in Smith's name in the Virgin Islands or New Hampshire. Tully Dep. at 22–24, 34; Fridlington Dep. vol. II at 42–43. GPH did locate a condominium development which was owned in part by "V.I. Condo Corp.," of which Heritage attorney Irving Labovitz was listed as an officer.[5] Pl.'s Ex. C at 36. It was later discovered in 1992 that Smith in fact had a secret partnership in V.I. Condo Corp. and several other commercial real estate ventures for which he had approved loans. Patterson Dep. vol. II at 112–18. These and other financial benefits, including cash bribes to Smith, did not surface in GPH's investigation, in part because the individuals involved concealed them, and in part because the GPH investigation was restricted to internal bank documents, public records, and interviews with five bank employees.[6]

On November 29, 1989, GPH attorneys Tully and Brackett Denniston presented the results of the investigation to the Heritage Board of Directors. The Board did not receive copies of the actual GPH Memorandum.[7] The Board Minutes for that meeting state:

5. Irving Labovitz was acquitted of all bank fraud charges at a jury trial before this court in October 1997.

6. Although no mention of the bank employee interviews appears in the November 29, 1989 Board Minutes, the GPH Memorandum itself reveals that these employees generally felt that although Smith was "held in high regard by the Bank," Pl.'s Ex. C at 23, "had a good rapport with customers" id. at 31, and was popularly known as "Mr. Northampton," id. at 26, he nonetheless could be "very forceful and intimidating," id. at 20, "would not hesitate to yell and scream to convince the committee to approve his requested loans," id., "had a big ego," id. at 32, "was very sensitive about his youth," id., and

that "if you wanted to advance your career at the Bank, you took orders from Smith … [H]e could make or break a person's career." Id. at 23.

7. The actual GPH Memorandum is an internal document dated November 27, 1989, and is addressed to senior GPH attorney Brackett Denniston from attorneys Smith, Tully, and Duffy. Pl.'s Ex. C. Additionally, FDIC Examiner Louis Gonzales testified that when he conducted his 1990 Annual Examination of the bank, he became aware of the GPH investigation through the November 29, 1989 Heritage Board minutes; when he asked if GPH had submitted a written report, he was told that GPH had not. Gonzales Dep. at 79–80.

Mr. Denniston stated that Goodwin, Procter & Hoar is unable to give assurances to the Directors that no wrongful conduct or criminal activity occurred. Mr. Denniston stated that Goodwin, Procter & Hoar was unable to find substantial evidence of self-dealing or criminal activity and believes that the possibility of wrongful conduct could not be eliminated without the commitment of enormous resources including the expenditure of substantial funds. Mr. Denniston stated that based on the confidential review conducted by Goodwin, Procter & Hoar, there is insufficient evidence of wrongdoing to require a report to the FDIC or to initiate a claim under the fidelity bond. Mr. Denniston stated that, subject to the results of the review and analysis of the disbursement information, Goodwin, Procter & Hoar recommends that the investigation be concluded.

Minutes of Board of Directors Meeting November 29, 1989, Pl.'s Ex. D.

Heritage paid $45,000 to GPH for the confidential review and investigation. Defs.' Ex. 16.

### 8. Information Learned by Heritage in Fall 1989 through 1990

Jack Patterson was hired by Heritage in September 1989 to head the bank's credit department, and was promoted to head of the loan department when Fridlington left the bank at the end of 1991. After the November 29, 1989 Board meeting, Patterson began handling workouts for several of Smith's troubled loans, including Cummington Farms and another real estate development called Saddle Hill. Patterson Dep. vol. II at 52–53, 56–58. In early 1990, Patterson received a call from another banker conducting a credit check on Smith, and learned that Smith was president of a company named "The Dutchmen, Inc.," which owned a condominium at Lake Sunapee, New Hampshire. Id. at 64–66. Patterson learned that Smith had borrowed $315,000 for the condo from another bank and that he had disclosed the loan on his Heritage financial disclosure form. Id. During 1990, certain Heritage employees made remarks to Patterson that Smith had a couple of new cars, a boat, a Rolex watch, and a fur coat for his wife. Id. At the time, these possessions appeared to Patterson to be inconsistent with Smith's $70,000–$80,000 salary, and Patterson wondered how a person with such a salary could have accumulated his reported debt of $500,000 to $600,000. Id. Patterson relayed to GPH and Fridlington bits and pieces of information as it came to his attention. Id. at 24–26, 30–33; Tully Dep. at 46–47.

### 9. Facts Relating to Manuel Duarte

In order to maintain a true chronological narrative, the court will detour slightly from the Smith story at this juncture to summarize the facts in this early 1990 time frame concerning another Heritage employee, Manuel Duarte. The FDIC has not presented a bond claim in this case for the losses caused to Heritage by the dishonest acts of Duarte, but the circumstances surrounding his employment and termination are relevant to the defendants' misrepresentation defense, and therefore warrant brief discussion.

Duarte was hired by Heritage/NIS to run the commercial lending office at the bank's Worcester, Massachusetts branch. He was terminated (with severance pay and health benefits) in March 1990 because of an unusually high level of delinquencies in the Worcester office's loan portfolio. Fridlington Dep. vol. II at 86–88. In April 1990, Heritage retained Alfred Dean as a consultant to do the workouts for the Worcester office's troubled loans. On May 21, 1990, Dean sent a memorandum to Fridlington advising him that Duarte had circumvented loan policy by making loans to third party "proxies" in order to overadvance funds to borrowers without having to go through the loan approval process. Pl.'s Ex. 57. On May 29, 1990, Fridlington wrote to Duarte that his severance agreement was terminated due to Duarte's deliberate and repeated violations of bank policy. Pl.'s Ex. J. In September 1990, Dean submitted a second and final memorandum regarding his review of the Duarte/Worcester portfolio. This memorandum made similar findings and included additional incidents of Duarte's misconduct. Def.'s Ex. 23.

Duarte's misuse of position and circumvention of board authority were reported to Heritage's Executive Committee in May and June 1990 by Fridlington and Patterson. Defs.' Ex. 26 at Bates H003875. The violations of lending policy uncovered by Dean's investigation of the Worcester portfolio had been discussed with FDIC examiners. *Id* at H003876. The situation was discussed at length at the Audit Committee meeting of July 18, 1990. Defs.' Ex. 27.

### 10. The 1990 FDIC Examination of Heritage/Gonzales' Report of Apparent Crime on Michael Smith

The court will now resume the main narrative involving Michael Smith.

In March 1990 the FDIC commenced an annual examination of Heritage headed by Louis Gonzales. During this time, the bank continued to experience losses on the Smith loans. As part of his assessment, Gonzales reviewed the 1989 FDIC Examination. He also learned from Fridlington that Smith had made loans to friends and to his brother-in-law Goggins, and had made loans without board approval. Additionally, Gonzales learned through his review of the Board of Directors minutes that GPH had conducted the 1989 confidential investigation. Gonzales testified that the evidence that Smith had extended approximately $20 million over his lending limit was the highest amount he had ever seen, and that he concluded that Smith was "abusing his authority as a lending officer, to the detriment of the Bank." Gonzales Dep. at 42–43.

After meeting with Patterson and Fridlington and informing them of his intentions, on June 14, 1990, Gonzales filed a Report of Apparent Crime concerning Smith's activities at Heritage ("Smith Report of Apparent Crime"). Fridlington testified that

[w]e weren't at that point sure what to do vis-a-vis Mike Smith and had a discussion with [Gonzales] as to should the bank be

filing something with the FDIC, an apparent crime form. [Patterson] and I had sort of uncertainty, if you will, as to what had been going on.

Fridlington Dep. vol. II at 45.

Gonzales told him and Patterson that the bank itself should have filed a report on Smith for having exceeded his lending authority and for violating bank policy on a regular basis. *Id.* at 46. After learning of Gonzales' intention to file the Smith Report of Apparent Crime, Patterson and Fridlington informed bank management of the same.[8]

Although the Smith Report of Apparent Crime characterized the suspected violations as "Misuse of Position or Self Dealing," the Report describes Smith's activities in very blunt terms, stating that Smith reportedly approved loans and credit overlines in excess of his lending authority "in apparent disregard for the interests of the bank and in contravention of policy .... The irregular and questionable activities attributed to [Smith] resulted in eventual large loan losses and damage to the financial condition of the bank." Smith Report of Apparent Crime, Pl.'s Ex. 158.

In Gonzales' account of the suspected violation (in response to Question 7b of the report form), he wrote:

Credit advances ... were in excess of $20 million.... Whether or not [Smith] received kickbacks or bribes through these or other lending activities could not be determined through account review as he did not maintain any deposit accounts at Heritage.... A review of his accounts at those institutions [where Smith was believed to maintain accounts] is recommended.

Goodwin, Procter & Hoar ... was authorized to conduct an independent, confidential review of Mr. Smith's portfolio. Results of the review were presented at an 11–29–89 meeting of the Board of Directors .... Assurances could not be given that no wrongful conduct or criminal activi-

---

**8.** Fridlington testified that he believed that he and Patterson also informed GPH at that time that Gonzales planned to file the Smith Report of Apparent Crime. Fridlington Dep. vol. II at 51–52. However, Tully of GPH testified in 1994 that

he believed he was unaware of the Smith Report of Apparent Crime until November 1990, when he met with Patterson and Fridlington to prepare for an interview with Agent Jim Scripture of the FBI. Tully Dep. at 52–53.

ty occurred but insufficient evidence (it was reported) existed to require a report to the FDIC or to initiate a blanket bond claim. It was recommended that, subject to the results of review and analysis of disbursements, that the investigation be concluded. Mr. Grant Jamieson, bank's internal auditor, stated that disbursement review was conducted but failed to reveal any tangible evidence of wrongdoing since Mr. Smith did not maintain any accounts at the Bank. A written report by the law firm reportedly was not provided to the bank.

. . .

[Bank officials] also stated that they have determined that Mr. Smith would intimidate employees who may have challenged his lending procedures.

*Id.*

Gonzales noted on the form that he had interviewed Fridlington, Patterson, and Jamieson in preparing the report. In response to Question 11a ("Who discovered the suspected violation and when?"), Gonzales stated, "Management of the bank was aware of the transactions but, in view of findings of Goodwin, Procter and Hoar, and the internal auditor, made no reports." *Id.* The Report also stated that "additional losses are possible" and that "[l]osses have been contributory to the institution's capital levels falling below regulatory minimum requirements." *Id.*

Gonzales submitted his June 1990 report directly to the FDIC regional field office. Astonishingly, Gonzales apparently *never forwarded* a copy of the Smith Report of Apparent Crime to Heritage, nor does it appear that Heritage or GPH ever requested a copy until *November 1990*, after Tully met with Fridlington, Patterson, and FBI Special Agent James Scripture, to discuss the Smith situation. This meeting had been requested by Agent Scripture and, according to Tully's memorandum to Denniston describing the interview, it was prompted by Gonzales' Report of Apparent Crime. Pl.'s Ex. V at 1.

## C. THE 1989 ST. PAUL BOND/HERITAGE'S INITIAL APPROACH TO LLOYD'S

Prior to and including 1989, Irene Soucy, the bank's treasurer, was responsible for Heritage's insurance programs. In 1989, Heritage hired Alexander & Alexander ("A & A") as an insurance broker. Gordon Langan of A & A's Hartford, Connecticut office, was the broker who handled the Heritage account.

A & A negotiated financial institution bond coverage from St. Paul Marine & Fire Insurance Company ("St.Paul") for the bond period from September 1, 1989 to September 1, 1990. Domenic Ritucci was the underwriter at St. Paul who took over the Heritage account.

By June 1990, St. Paul indicated that it was considering the cancellation or non-renewal of its bond due to Heritage's deteriorating financial condition; however, Ritucci advised Langan that he would hold off sending a notice of cancellation or non-renewal until he had an opportunity to meet with the bank. Pl.'s Exs. 15–16 (notes of telephone conversations between Ritucci and Langan). A meeting between St. Paul, Langan, and representatives from Heritage was later set for July 26, 1990 to discuss the situation.

In the meantime, on July 6, 1990, Langan spoke with Soucy and explained that St. Paul was nervous and might wish to "non-renew" the policy subject to a 90–day cancellation notice. Defs.' Ex. 36. Langan recommended approaching the London market for coverage, aware that Lloyd's actively pursued insurance business from distressed financial institutions in the United States. Pl.'s Ex. 36; Langan Dep. at 104–06. Soucy agreed. In her confirming letter of July 6, 1990, Soucy also advised Langan that Joe Barbato, senior vice president of operations, would be taking over the administration of the bank's insurance program and would be at the July 26, 1990 meeting with St. Paul. Pl.'s Ex. L.

On July 9, 1990, Langan sent Soucy a letter enclosing a Lloyd's Blanket Bond Proposal Form (the "LPO 230A") and Supplemental Questionnaire. That same day, before Langan received a completed Lloyd's application from Heritage, he sent a number of Heritage documents, including the 1988

and 1989 annual reports, the 1988 and 1989 Peat Marwick Management Letters, and the expiring St. Paul bond to Sam Cargill of A & A's New York office, and asked for Cargill's assistance in approaching the London market. Pl.'s Ex. 226. Cargill acted as an intermediary to registered Lloyd's brokers in London. On July 17, 1990, Cargill forwarded the documents, and later Heritage's 1989 St. Paul bond application, to Simon Ashby of Holmes, Johnson & Lessiter, Ltd. ("HJL"). HJL was a registered Lloyd's broker, and a subsidiary of Alexander Howden Ltd. ("Howden"), also a Lloyd's broker. A & A could not negotiate directly with Lloyd's of London underwriters because Lloyd's permits only London brokers registered and regulated by the Council of Lloyd's to make these approaches. It was A & A's policy at the time to have its United States brokers use Howden.

On July 26, 1990, the meeting to discuss the St. Paul bond took place between Ritucci of St. Paul, Langan of A & A, and Soucy and Barbato of Heritage. St. Paul made no decision at this meeting as to whether to renew the bond.

On August 1, 1990, on the basis of the initial materials received about Heritage (including the 1989 annual report, the 1989 Peat Marwick Management Letter, and the 1989 St. Paul bond), the lead underwriter at Lloyd's furnished a preliminary indication of terms and conditions for a blanket bond, subject to receipt of a Lloyd's general application form (LPO 230A) and Supplemental Questionnaire. Pl.'s Ex. 29 (fax from Ashby to Cargill). This indication proposed a premium of $102,500 for the one-year bond, but Ashby made a note to Cargill stating, "As discussed we would appreciate it if you could obtain more premium." *Id.*

That same day, Barbato completed the official Lloyd's application package with the LPO 230A and the Supplemental Questionnaire, which he sent to Langan. Barbato had circulated portions of the application to various individuals at Heritage. Soucy assisted Barbato in completing Section 19 of the LPO 230A, the main subject of defendants' misrepresentation defense.

On August 13, 1990, Ritucci of St. Paul advised Langan by phone that St. Paul had decided *not* to renew its bond. Ritucci proposed however, that instead of issuing a 90–day notice of cancellation, St. Paul would be willing to accept a signed release from Heritage, which would extinguish any liability of St. Paul as of the date of the release. Ritucci told Langan that the release would be beneficial to Heritage because if St. Paul issued a notice of cancellation or non-renewal, it would be difficult for Langan to market the coverage to another insurer. Ritucci Dep. at 85.

In a letter dated August 17, 1990, Langan informed Soucy of the situation, and commented that "[h]andling the cancellation with St. Paul in this fashion avoids having to disclose on any future Financial Institution Bond applications of being canceled, non-renewed, or declined by a previous carrier." Pl.'s Ex. 28. In turn, Soucy wrote a memorandum to Covell on August 20, 1990, stating:

> St. Paul is not willing to renew, however they will not cancel our present coverage if we are willing to sign an agreement that we will not present them with any claims through the expiration date. What this means is we would not have a "cancellation black mark" on our record. We have no claims pending nor do I anticipate any in the near future. This is the way we should proceed for 9–1–90.

Pl.'s Ex. 31.

That same day, Soucy sent the signed release form to Langan, leaving the effective date of release blank. Pl.'s Ex. 36a. Langan later filled in the date of September 1, 1990 and sent it to St. Paul. Langan Dep. at 468–69.

## D. THE 1990 LLOYD'S BOND APPLICATION

As stated above, on August 1, 1990, Barbato forwarded to Langan Heritage's completed LPO 230A, Pl.'s Ex. 30a, and the Supplemental Questionnaire, Pl.'s Ex 30b, with applicable exhibits and reports.

The LPO 230A states on the cover page: PLEASE NOTE: Every Proposer or Assured, when seeking a quotation, taking

out or renewing an Insurance Policy, is required to advise to the prospective Insurers any material fact or information which might affect the judgment of the Insurer in deciding whether to accept the insurance or assessing the conditions of that insurance. Failure to observe this obligation could avoid any contract entered into at inception.

Heritage's responses to Questions 19(a)-(c) of the LPO 230A, Pl.'s Ex. 30a, form the first part of defendants' misrepresentation defense. These questions, and Heritage's responses, were as follows:

> 19.(a) Has any proposal for Insurance of this nature been declined by any Insurance Company or Underwriter at Lloyd's, or has any policy been canceled or renewal thereof refused? If so, state reasons.

Heritage's response: No.

> (b) Have you any knowledge of, or information concerning any occurrence or circumstance whatsoever, which might materially affect this proposal?

Heritage's response: No.

> (c) Please state in detail, any irregularities in banking or financial operations discovered by, or under investigation by, governmental or banking authorities, *or known to the Bank* during the past 3 years.

Heritage's response: None.

Pl.'s Ex. 30a (emphasis supplied).

Question 20 of the LPO 230A asks:

> Please give in the space provided below, brief details of any loss or losses which you have sustained during the past five years, and/or any *circumstance likely to give rise to a loss or losses in excess of U.S. $5,000 (whether insured or uninsured )*.

Heritage's response identified five instances of embezzlement ranging from $8,400 to $67,000. *Id.* (emphasis supplied).

Question 2(b) of the Supplemental Questionnaire asks:

> Have there been any changes in either Directors or Officers during the last three years? If yes, please attach complete explanation for the changes and resumes of the new Directors and Officers.

Heritage's response: "Refer to Annual Report." Pl.'s Ex. 30b.

The only reference in Heritage's 1989 Annual Report to changes in officers or directors appears on page 2, in President and CEO Richard Covell's Letter to Stockholders. The relevant passage states:

> As part of our efforts to restructure and redirect our operations, we have trimmed down our management structure. As previously announced, Roy A. Scott, President and Chief Operating Officer, and Robert C. Peck, Senior Executive Vice President, have resigned; *we have also eliminated sixteen other positions, including those of seven other officers*. In the past year, we have added two Senior Vice Presidents, John J. Patterson and Charles D. Jeffrey, who provide us with additional expertise in the loan workout and investment portfolio areas. These changes represent a major effort to restructure management with emphasis on resolving asset quality issues and achieving cost containment objectives, while repositioning Heritage to improve financial performance in the future.

Pl.'s Ex. 83 (emphasis supplied).

The final page of the LPO 230A contains a declaration that provides, in part:

> We declare that the statements and particulars in this proposal are true and that we have not misstated or suppressed any material facts. *We agree that this proposal together with any other information supplied by us shall form the basis of any contract of insurance effected thereon and shall be incorporated therein.*

Pl.'s Ex. 30b at Bates A & A 101248 (emphasis supplied).

The LPO 230A was signed by Covell, Everett Peterson, Assistant Vice President of Security, and Fred Schluter, Executive Vice President and Chief Financial Officer. These signatures were not dated. *Id.*

After reviewing Heritage's application, Langan sent them on August 9, 1990 to Cargill in New York, who forwarded them to Ashby in London on August 13, 1990.

On August 28, 1990, A & A presented Heritage with a written proposal that included the terms of the proposed Lloyd's cover-

age. Heritage accepted the proposal at a $122,500 premium, $20,000 above the $102,500 in Ashby's August 1 indication.[9]

On August 31, 1990, Langan informed Barbato at Heritage that the Lloyd's coverage was bound effective September 1, 1990.[10] Heritage eventually received the final bond document in April 1991.

## E. DEVELOPMENTS AT HERITAGE DURING THE LLOYD'S BOND PERIOD (SEPTEMBER 1, 1990 TO AUGUST 31, 1991)

### 1. Manuel Duarte

As stated above, Manuel Duarte of Heritage's Worcester branch office was terminated in March 1990 because of substantial delinquencies in his loan portfolio and for having deliberately circumvented bank loan policy. Duarte's conduct was reported to FDIC Examiner Gonzales, who recommended in the 1990 FDIC Examination Report that a criminal referral be filed on Duarte.[11] Defs.' Ex. 18 at Bates H024017.

Fred Dean, the consultant hired to do Duarte's loan workouts, submitted his final report to Fridlington on Duarte's portfolio on September 18, 1990. On October 3, 1990, Fridlington filed a Report of Apparent Crime on Duarte ("Duarte Report of Apparent Crime"), reporting Duarte's willful violations of Heritage's lending policy by lending to third-party (nominee) borrowers to circumvent his lending limit. Like the Smith Report of Apparent Crime, the Duarte Report of Apparent Crime characterized his suspected violations as "misuse of position/self-dealing." Pl.'s Ex. 55a.

On October 30, 1990, Fridlington sent a letter to HJL in London (in care of Langan at A & A), giving Lloyd's notice of an occurrence giving rise to a possible claim for Duarte. Pl.'s Ex. 46. Heritage ultimately confirmed that the Duarte loss had been discovered in *April 1990* while Heritage was covered under the *St. Paul* bond. Defs.' Exs. 59–60. It is for this reason that plaintiff is not seeking to recover from defendants for any losses caused by Duarte.

### 2. Michael Smith

### a. November 1990 Meeting with FBI Agent Scripture

In November 1990, Heritage was contacted by FBI Agent Jim Scripture to discuss the Smith Report of Apparent Crime. Attorney Tully of Goodwin, Procter & Hoar met with Fridlington and Patterson on November 13, 1990 to review the bank's knowledge of the Smith situation in anticipation of the FBI's questions.[12] Defs.' Exs. 13 & 46. Patterson advised Tully at that meeting that "Investment Partners, Inc.," a corporation made up of five Heritage borrowers all close to Smith, was showing a one-sixth interest that was unaccounted for. Defs.' Ex. 13 at 85; Ex. 46. They also discussed Smith's known assets, including his interest in The Dutchmen, Inc., the $300,000 mortgage on the Lake Sunapee property, Smith's personal residence, his two new cars, his boat, and his interest in the Virgin Islands condominium. *Id.* Patterson also said that Irving Labovitz had told him that Smith's interest in the Virgin Islands condo was the "equivalent of a time share." Defs.' Ex. 46; Tully Dep. at 87–88.

Tully, Patterson, and Fridlington met later that same day with Scripture. Scripture's questions focused on three areas: Smith's position and authority, Smith's misuse of his position and/or actions beyond his authority, and Smith's assets, financial condition, and lifestyle. Defs.' Ex. 48. Fridlington de-

---

**9.** Langan testified that A & A did not inform the bank of the $102,500 initial quote. Langan Dep. at 407–10.

**10.** The bond actually was not fully underwritten until September 15, 1990.

**11.** The 1990 FDIC Examination Report was not submitted along with other materials in Heritage's 1990 Lloyd's application form, apparently because Heritage had not yet received the final report at that time. Pl.'s Ex. 30b at Bates A & A 101380.

**12.** In his 1994 deposition, Tully testified that this November 1990 meeting between Heritage and the FBI was the first time he became aware of the Smith Report of Apparent Crime. Tully Dep. at 52–53. However, Fridlington testified that he believed GPH had been informed earlier of FDIC Examiner Gonzales' intention to file the report. Fridlington Dep. vol. II at 51–52.

scribed Smith's major lending relationships, including Cummington Farms, and the Sutton and Rostoff loans. Tully's memorandum to GPH attorney Denniston memorializing this meeting stated that, "Overall, Scripture indicated that an extensive investigation is unlikely." Pl.'s. Ex. V at 3. However, Scripture stated that the file would remain open while other related investigations were pending, and that it would be turned over to a Springfield Assistant U.S. Attorney. *Id.*

Tully testified that at that time, while there were suspicions about Smith, his behavior was still generally viewed as a matter of bad loans and poor judgment. Tully Dep. at 110–11. However, within two weeks of the meeting with the FBI, Tully asked Barbato at Heritage for copies of the fidelity bonds in effect since Smith's August 1989 departure. Defs.' Ex. 49 (11–27–90 Tully Memorandum).

### b. First Grand Jury Subpoena

Six weeks after the meeting with Agent Scripture, on January 4, 1991, Heritage received a grand jury subpoena requesting all of Smith's loan files, all meeting minutes involving those loans, and Smith's personnel file. Pl.'s Ex. 50.

### c. Smith's Assets

Beginning in late 1990 to early 1991, Patterson had several anecdotal conversations with loan officers Lucille Cernak and David Barszcz about Smith's lifestyle and luxurious possessions such as a Rolex watch, his wife's fur coat and diamond ring, and Smith's new car and boat. Patterson Dep. vol. II at 102–03.

By April 1991, Patterson learned from Heritage borrower Matthew Pitoniak that Smith was in fact a partner in the Virgin Islands condominium with Irving Labovitz, Pitoniak, and Timothy Sicard, another friend and customer of Smith. *Id.* at 67–72. Smith's interests in the condo were not reflected in public records, nor had he reported it on his Lending Relationship with Executive Officers Form. At some point that spring, Labovitz told Patterson and Fridlington that Smith, Sicard, and Pitoniak had been brought into the condominium, after Labovitz bought it, to help him with the negative cash flow. Patterson and Fridlington were concerned and suspicious about the fact that Labovitz had not been forthcoming about his relationship with Smith, particularly their shared interest in the Virgin Islands condominium, which Labovitz had falsely described as "equivalent to a time share," and the fact that Smith had not disclosed this interest.[13]

In late 1990 and early 1991, during the workout process on the Smith loans, Patterson detected a pattern of missing pieces of ownership in three partnerships involving customers of Smith. Patterson became suspicious that Smith was the missing piece. Patterson Dep. vol. II at 116–17, 135–41. Patterson kept Fridlington and Tully informed of his suspicions. Fridlington Dep. vol. II at 55, 76, 79, 98–99; Patterson Dep. vol. II at 18, 25–26, 31–32, 107. By late spring, Patterson asked GPH whether a bond claim could be filed on Smith and whether the bank had an obligation to file a criminal referral on him, but was advised by GPH that these were not warranted. Patterson Dep. vol. II at 107, 137.

### d. Second Grand Jury Subpoena

On April 12, 1991, Heritage received a second grand jury subpoena, requesting all documents for loan files relating to Smith's college roommate Ira Sutton, files for which Smith had been responsible. Pl.'s Ex. Y. On April 30, 1991, Tully sent Fridlington a letter recommending that CPH coordinate Heritage's responses to the subpoenas in the Smith, Duarte, and Sutton investigations. Pl.'s Ex. Z.

---

13. Labovitz did not disclose to Patterson and Fridlington at that time that Smith was in fact in V.I. Condo from the beginning and received a risk-free 50% interest in the condo in Smith's wife's name; that Smith got valuable tax deductions; that Pitoniak and Sicard were brought in later to help with the negative carry; and that Smith and Labovitz split the $10,000 paid by Pitoniak and Sicard into the corporation. Defs.' Ex. 68 at 6–10 (Heritage's Proof of Loss Provided to Underwriters 3–16–92).

*3. Heritage's 1991 Renewal of the Lloyd's Bond and the August 5, 1991 FBI Contact*

In July 1991, A & A began to negotiate a renewal bond for Heritage as the 1990 bond was due to expire on August 31, 1991. Heritage submitted a renewal application on July 23. On its 1991 renewal application, Heritage stated in response to Question 19(b) of the LPO 230A (concerning known "irregularities"): [14]

19.(b)

1. From 1988 to 1990, a lending officer repeatedly violated the Bank's Lending Policy by extending loans to customers of the bank that on a one obligor basis were substantial [sic] in excess of his voted lending authority. By lending dollar amounts just below his lending authority limit to customers on an individual basis and not reporting the linkages between individual borrowers as required under the Bank Loan Policy, the lending officer effectively substantially exceeded his loan authority and extended substantial amounts of unsecured credit to individuals, which when combined under a one obligor concept, has caused the Bank substantial loan losses (in excess of $3,000,000).

2. FDIC has filed a report of apparent crime concerning a lending officer. The issues being investigated are loans in excess of his voted lending authority and loans in excess of his lending authority to individuals that *may* have other related interests with the lending officer outside of the Bank. The Bank has supplied loan file information to the U.S. Attorneys office in Springfield, MA.

Pl.'s Ex. 70.

The responses to these questions in 1991 are puzzling for several reasons. First, they roughly describe the Duarte and Smith situations, yet neither individual is specifically identified. Second, in July 1991, the Duarte

issue, described in 19(b)(1.), was already a pending bond claim,[15] and the bank itself had filed a Report of Apparent Crime on Duarte the previous October—yet this is not mentioned in Heritage's response. At the same time, Heritage *does* refer, in 19(b)(2.), to the *Gonzales'* Report of Apparent Crime (on Smith), which had been filed months before the bank completed its *1990* application. Significantly, with the exception of the U.S. Attorneys' involvement in the case, there is nothing in Heritage's response to Question 19(b) in its 1991 application that Heritage did not already know in August *1990* when it first applied for the fidelity coverage with Lloyd's, and answered "None" to the same question.

On August 5, 1991, FBI Special Agent T.J. Roberts contacted GPH attorney Tully. According to Tully's notes of this conversation, Agent Roberts told Tully that he was a bank fraud specialist, that he had been reassigned from Boston to Springfield to work exclusively on the Smith case, and that he wanted to interview Covell. Pl.'s Ex. AP. Tully later testified that this conversation led him to believe that Agent Roberts had a strong case against Smith, and that it gave him the impression that Roberts had information that Smith had received financial benefits. Tully Dep. at 163–69.

On August 14, 1991, Langan of A & A wrote to Fred Schluter at Heritage that he had received preliminary indications from Lloyd's that the renewal policy would contain more restrictive terms and a higher premium. Defs.' Ex. 52. Langan noted that Lloyd's might add a "retroactive date" to the renewal policy, which would limit coverage of losses to those actually sustained *after* that date. Langan advised that:

[s]hould the underwriters place a retroactive date endorsement to your policy at renewal, the bank needs to be prepared to quickly file a due diligence providing notice for any potential instances aware [sic] of

---

**14.** In the 1990 LPO 230A form, Question *19(c)* asked the applicant to describe "irregularities" in banking operations. In the 1991 form, the same question was renumbered *19(b)*.

**15.** Heritage had given notice to Lloyd's of a claim involving Duarte on October 30, 1990. On

July 9, 1991, Heritage confirmed that discovery of the Duarte occurrence was in April 1990 under the *St. Paul* policy, and informed Lloyd's a day later that Lloyd's could close its file. Defs.' Ex. 60. However, Heritage continued to pursue the Duarte claim with St. Paul.

which might give rise to a claim under the existing policy. To be prepared we would suggest researching any instances prior to 9/1/91 in case the retrodate stated is the inception date for this renewal[,] ... the date [Lloyd's] first became involved in your coverages.

*Id.* at 2.

Langan spoke with Barbato and reviewed Lloyd's renewal proposal with him on August 26, 1991. Defs.' Ex. 53. Barbato spoke to Langan that day and again on August 28 about suggestions for compiling a "laundry list" notice of possible losses sustained prior to September 1, 1990. *Id.*

On August 28, 1991, Langan faxed Barbato a letter regarding the terms of the renewal quote. Pl.'s Ex. 81. In it, Langan confirmed that the renewal bond contained a loss sustained rider with a retroactive date of September 1, 1990. He advised that the renewal bond "shall only cover losses *sustained* on or after the retroactive date; in effect, eliminating the discovery provision of the bond. Therefore, any loss(es) *sustained prior to* 9/1/90 but *discovered after* 9/1/90 will no longer be covered under this bond." *Id.* (emphasis in original).

In the same letter, Langan added:

Obviously Joe, the most critical change is the inclusion of the loss sustained rider with the retro-date of 9/1/90. As you requested on 8/26/91, we did pursue with Lloyd's as to providing alternative quotes to eliminate the loss sustained rider or provide a retro-date which goes back further than 9/1/90.

*Id.*

Langan added that Lloyd's was unwilling to remove the loss sustained rider at any price, but would agree to roll back the retroactive date to September 1, *1989* if Heritage would pay an additional premium of $20,000 and provide Lloyd's with a letter indicating no known losses from 9/1/89. *Id.*

At 9:30am on Friday, August 30, 1991, Barbato called Langan and told him that their attorney wanted to "put together some general verbiage on Smith and Duarte notifying London on Bond." Defs.' Ex. 55. Later that day, just two days before the 1990 bond

was to expire, Barbato faxed a letter to Howden in London to provide notice to defendants of a claim arising from Smith's conduct. This letter was drafted by GPH, and was received by Howden at 4:30 p.m. London time. It stated, in relevant part:

The Insured has recently been advised that the Federal Bureau of Investigation has renewed a comprehensive investigation concerning a former lending officer, Michael Smith, which investigation concerns, *inter alia,* loans in excess of approved amounts and loans to individuals or entities with whom he may have had relationships. The Insured believes that the activities of the former lending officer have resulted or will result in losses to the Insured, which losses are estimated at this time to be in excess of $5 million.

Pl.'s Ex. 174.

At the time he signed the letter, Barbato himself knew nothing of the FBI investigation referred to in the letter (which, again, was drafted by GPH), nor did he have any personal knowledge of Smith's actual receipt of any financial benefit from his alleged wrongful acts. Barbato Dep. at 130–31.

## F. EVENTS FOLLOWING HERITAGE'S NOTICE TO LLOYD'S

On November 15, 1991, Langan of A & A met with Schluter, Barbato, and Fridlington to discuss the Smith claim, and issues surrounding notice, discovery, and the time for filing a proof of loss. Langan Dep. at 333–45. Langan's notes reflect concern over the date of discovery, given that Heritage had disclosed the Smith and Duarte circumstances (although not by name) in its July 22, 1991 renewal application. Pl.'s Ex. 215. The handwritten notes also state:

What is unclear is when prior to [Heritage's renewal] app was sufficient knowledge/information available to become aware of potential loss under bond.

*Id.*

On December 18, 1991, Barbato called Langan and informed him that Heritage's position on the date of discovery was "within a few days earlier of 8/30/91" because Heritage *"didn't have proof of any dishonesty*

*until received FBI report just prior to 8/30/91.*" Defs.' Ex. 57 (Langan notes of conversation) (emphasis supplied). Barbato stated that the bank's position came after consultation with counsel. *Id.*

On March 13, 1992, Heritage supplied defendants with its Proof of Loss. Defs.' Ex. 68. In it, the bank asserts:

> Smith's dishonest and fraudulent acts . . . . involved, *inter alia,* extending credit to certain borrowers who either secretly participated with Smith in real estate development projects or otherwise covertly provided valuable considerations to Smith. Smith and the borrowers, moreover, concealed Smith's dishonest and fraudulent acts from the Insured. Additionally, Smith made sizable loans to certain other friends and business associates under circumstances which reasonably give rise to the conclusion that a financial benefit may have been conferred on Smith.

*Id.* at 2.

In December 1992, the bank was declared insolvent and the FDIC was appointed receiver. In March 1994, the FDIC submitted a "Supplemental Proof of Loss" on the Smith claim, alleging losses in excess of $32 million. On March 24, 1995, the FDIC filed this suit to recover for the Smith losses.

## III.  DISCUSSION

The FDIC seeks to recover under the fidelity provisions of Banker's Blanket Bond No. 834/9010020. The Revised Fidelity Insuring Agreement of the bond covers losses "resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others." Pl.'s Ex. 65 at 19. With respect to loan activity, the bond covers *only* "loss resulting directly from dishonest or fraudulent acts committed by an employee *with the intent to make and which results [sic] in a financial benefit for the Employee.*" *Id.* (emphasis supplied).

Moreover, the bond only applies to "loss discovered by the Insured during the bond period." *Id.* at 13. "Discovery" occurs

> when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has

been or will be incurred, even though the exact amount or details of loss may not then be known.

*Id.*

Finally, the Notice provision of the bond states:

> At the earliest practicable moment, not to exceed 30 days, after discovery of loss, the Insured shall give the Underwriter notice thereof.

*Id.*

Defendants apparently concede that Smith's dishonest and fraudulent acts were committed with the intent to receive financial benefit, and that Smith's acts resulted in financial benefit to him. Defendants, however, have denied recovery under the bond and have moved for summary judgment on the following grounds: 1) the 1990 Lloyd's bond is void *ab initio* under Mass. Gen. Laws ch. 175, § 186 because Heritage made material misrepresentations in its application; 2) pursuant to the bond's "Cancellation or Termination" provision, the bond "terminated" as to Smith since Heritage learned of many of Smith's dishonest or fraudulent acts prior to the commencement of bond coverage; 3) pursuant to the bond's "Discovery" provision, the losses attributed to Smith are not covered by the bond because the losses were "discovered" before the bond period; and 4) even assuming that the losses were "discovered" *during* the bond period, Heritage failed to give notice to defendants of the Smith claim within the 30–day time limit required by the bond.

Because the court finds the defendants' first and fourth arguments—misrepresentation and failure of notice—to be dispositive, it will not be necessary to discuss at any length defendants' other grounds.

## A.  MISREPRESENTATION

Defendants argue that they are entitled to rescission of the 1990 Lloyd's bond pursuant to Mass. Gen. Laws ch. 175, § 186, because Heritage misrepresented material facts in its 1990 application when it failed to disclose information known to it on the LPO 230A and Supplemental Questionnaire.

Defendants' allegations of misrepresentation can be divided into three distinct claims. First, defendants argue that Heritage withheld critical information about Duarte and Smith in its responses to Question 19(b) (known "occurrences or circumstances" that "might materially affect" the proposal) and Question 19(c) ("irregularities" under investigation or known to the bank). Second, defendants contend that Heritage failed to disclose fully information regarding its "changes in officers" under Question 2(b) in the Supplemental Questionnaire. Finally, defendants submit that Heritage manipulated the termination of its St. Paul coverage in response to Question 19(a) in a deliberate attempt to avoid disclosing to Lloyd's that St. Paul had elected not to renew its bond.

Plaintiff responds to defendants' misrepresentation defense by arguing that Mass. Gen. Laws ch. 175, § 186 is inapplicable to this case, and that, instead, defendants must meet the more onerous burden of establishing the common law elements of fraud. In addition, plaintiff vigorously disputes the suggestion that Heritage falsely answered these questions or (even if it did), that the misinformation was material. Finally, plaintiff asserts that the defendants waived any defense based on Heritage's non-disclosure in 1990 of facts regarding Smith or Duarte because when the defendants were put on notice of this information (in Heritage's *1991* renewal application), defendants apparently ignored it, and thereafter collected premiums and issued the renewal bond.

1. *Applicability of Mass. Gen. Laws ch. 175, § 186*

▪ The bond provisions at issue in this case form part of an insurance contract made in Massachusetts. Therefore, Massachusetts' law of contracts controls the interpretation of the bond's contractual terms.

*FDIC v. Insurance Co. of N. Am.,* 928 F.Supp. 54, 58 (D.Mass.1996).

Because an insurance contract transfers a defined risk from the insured to the insurer for a premium calculated to reflect the nature of the risk, the integrity of this process disintegrates when an insurer is induced by misrepresentations or omissions into accepting a risk it would have otherwise rejected, or accepting a risk on more lenient terms or at a lower premium than it would have if the true facts had been disclosed. *See* Joseph K. Powers, *Pulling the Plug on Fidelity, Crime, and All Risk Coverage: The Availability of Rescission as a Remedy or Defense,* 32 Tort &. Ins. L.J. 905, 906 (1997). The law of rescission, therefore, operates as a major enforcement tool in regulating the dynamics of the insurance marketplace. *Id.* at 907.

▪ Massachusetts, like many states, has enacted a statute governing the right of an insurer to rescind contracts of insurance. Mass. Gen. Laws ch. 175, § 186 provides:

No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss.

. The FDIC contends that § 186 does not govern the 1990 bond at issue here. It relies on *Compagnie De Reassurance D'Ile De France v. New England Reins. Corp.,* 57 F.3d 56, 85 (1st Cir.), *cert. denied,* 516 U.S. 1109, 116 S.Ct. 564, 133 L.Ed.2d 490 (1995), for the proposition that § 186 allows rescission only where an insurance contract *contains a warranty.*[16] Here, there was no such warranty.[17] Therefore, plaintiff argues, the

16. Plaintiff also argues that the parties agreed to limit rescission to instances of *intentional* misrepresentation. Such (arguably) limiting language appeared at one point in the prefatory language of the bond. The parties agree, however, that the language was deleted in the final bond eventually received by Heritage.

17. The parties do not dispute that there is no warranty in this case, and agree that Heritage's

answers in the 1990 bond application were "representations." The bond language itself provides that "[n]o statement made by or on behalf of the Insured, whether contained in the application or otherwise, shall be deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement." Pl.'s Ex. 65 at 6 ("General Agreement D: Warranty").

provision does not apply, and, as a result, defendants must establish the elements of common law fraud, which include reasonable and justifiable reliance. *See id.* at 73. Plaintiff argues at great length that defendants cannot show such reliance.

Despite plaintiff's efforts, it is quite apparent that its contention that § 186 is inapplicable to the 1990 bond is founded on a distorted reading of *Compagnie.*

*Compagnie* involved alleged misrepresentations made on a "Placing Information," which was circulated to brokers to solicit business from the reinsurance market. The complaint in that case alleged, *inter alia,* common law fraudulent inducement. *Compagnie,* 57 F.3d at 61. The party alleging the fraud argued that proof of reliance was not needed, and cited *Shapiro v. American Home Assur. Co.,* 584 F.Supp. 1245 (D.Mass. 1984), *Pahigian v. Manufacturers' Life Ins. Co.,* 349 Mass. 78, 206 N.E.2d 660 (1965), and *Davidson v. Massachusetts Cas. Ins. Co.,* 325 Mass. 115, 89 N.E.2d 201 (1949), in support of its contention. *Compagnie,* 57 F.3d at 85.

The First Circuit distinguished that line of cases, describing them as "deal[ing] with misrepresentations made on a form application for a policy of insurance, which application was then attached to and became part of the policy." *Id.* at 85.[18] The court characterized this group as "warranty" cases, and explained that a "warranty," in insurance law, is a "statement, stipulation, or condition *which forms part of the contract,* whereby the insured contracts as to the existence of certain facts, circumstances, or conditions, the literal truth as to which is essential to the validity of the contract." *Id.* (quoting 9 George J. Couch, *Cyclopedia of Insurance Law* § 36:1 (2d ed.1985)). The First Circuit found that the Placing Information in *Compagnie* was not a warranty, in that it was neither incorporated in, nor attached to, the contracts at issue in that case. *Id.* The court then added that *Shapiro, Pahigian,* and *Davidson* were all decided under Mass. Gen. Laws ch. 175, § 186, a statute "not at issue" in *Compagnie* and "arguably inapplicable" to the situation there. *Id.*

The First Circuit concluded from this comparison that the party alleging fraud in *Compagnie* could not rely on the *Shapiro* line of case law to argue that it need not prove reliance. *Id.* ("We, therefore, find no basis in *Shapiro* for making an exception here to the Massachusetts requirement that a plaintiff seeking recovery in [common law] fraud must prove reliance on the misrepresentations made."). *Id.* at 85–86.

Contrary to plaintiff's assertions, the court's commentary in *Compagnie* cannot be read to *limit* rescission under § 186 to policies containing warranties. Such an interpretation is contrary to both the plain terms of the statute and longstanding case law construing it.

Under common law, warranties, if false or untrue, rendered a policy voidable by the insurer wholly irrespective of the materiality of the statement or promise. *Nonantum Inv. Co. v. Maryland Cas. Co.,* 56 F.2d 329, 332 (1st Cir.1932). On the other hand, false representations could invalidate a policy under common law only if such misrepresentations were material. *Shapiro,* 584 F.Supp. at 1249 (citing *Campbell v. New England Mut. Life Ins. Co.,* 98 Mass. 381, 395 (1867)).

Mass. Gen. Laws ch. 175, § 186 was enacted to abolish this common law distinction between warranties and misrepresentations, and made a breach of warranty claim no more onerous for the insurer than a false representation. *See Nonantum,* 56 F.2d at 332; *Metropolitan Life Ins. Co. v. Burno,* 309 Mass. 7, 11, 33 N.E.2d 519 (1941). In other words, the insurer faces the same burden of proof as to materiality with respect to both breaches of warranty and misrepresentations. Thus, under the statute, the insurer seeking rescission must demonstrate that the

---

**18.** Plaintiff ignores the contextual dissimilarity of the misrepresentations at issue in *Compagnie.* There, the First Circuit acknowledged a categorical distinction between information prepared and proffered in an effort to solicit potential reinsurers, and information provided by an insured on an application form in response to questions posed by the insurer. *Compagnie,* 57 F.3d at 80, 85. Addressing whether the false representations on the Placing Information provided a basis for a fraud claim, the court noted that "[m]atters would have been different" had defendants "given incomplete, evasive, or incorrect answers to questions asked." *Id.* at 80.

"misrepresentation *or* warranty" made in the negotiation of an insurance contract was material. Mass. Gen. Laws ch. 175, § 186 (emphasis supplied). The insurer can accomplish this (and avoid the policy) by showing either that the misrepresentation or warranty was made "with actual intent to deceive," or that it "increased the risk of loss." *Id.*

■ While the statute changed the law with respect to warranties, it merely codified the existing common law principle regarding representations. *Burno,* 309 Mass. at 11, 33 N.E.2d 519. The statute established that "[m]isstatements of fact, whether the statement is said to be by the parties a warranty or a representation, are equally misrepresentations, and are placed in each case upon the same footing by the statute which applies to them if the statements are called 'warranties' by the parties no less than if they are mere 'representations.'" *Nonantum,* 56 F.2d at 332 (quoting *White v. Provident Sav. Life Assur. Soc.,* 163 Mass. 108, 115, 39 N.E. 771 (1895)). In no way did the statute somehow eliminate the remedy of rescission for material misrepresentations, however. Recent case law decided under § 186 confirms that rescission may be based on mere representations given on an application, where such false representations are material. *See, e.g., Northwestern Mut. Life Ins. Co. v. Iannacchino,* 950 F.Supp. 28 (D.Mass.1997); *Protective Life Ins. v. Sullivan,* 892 F.Supp. 299, 302 (D.Mass.1995).

■ Moreover, the statute cannot be read explicitly to require a fidelity bond insurer to incorporate or attach a policy application to the final contract in order to invoke a material misrepresentation defense under § 186; the terms of the statute require only that the misrepresentation be made "in the negotiation of a policy of insurance."[19] In any event, any such implicit requirement of the statute was met, as the LPO 230A application form completed by Heritage contained a declaration that the application and any other information supplied by Heritage "shall form the basis of any contract of insurance effected thereon and shall be incorporated

therein." Pl.'s Ex. 30a, at Bates A & A 101248.

Thus, *Compagnie* cannot be read to restrict § 186 to policies that contain warranties, and plaintiff's efforts to convince the court otherwise are unavailing. Defendants base their defense in this case on alleged misrepresentations made in the negotiation of the 1990 blanket bond—a claim that falls squarely within the parameters of Mass. Gen. Laws ch. 175, § 186. As such, defendants need not demonstrate reliance to be entitled to rescission, as long as they can prove that the misrepresentations were material. *See Iannacchino,* 950 F.Supp. at 31 ("[U]nder Massachusetts law 'reliance' is not a prerequisite for proof of invalidation of an insurance policy . . . ."); *cf. Shapiro,* 584 F.Supp. at 1250.

Having concluded that the statute governs the 1990 bond, the court must decide whether Heritage's responses on the 1990 application were material misrepresentations.

### 2. *Materiality of the Alleged Misrepresentations*

■ A misrepresentation is "material" if it concerns a fact, "the knowledge or ignorance of which would naturally influence the judgment of the underwriter in making the contract at all, or in estimating the degree and character of the risk, or in fixing the rate of the premium." *Employers' Liab. Assurance Corp. v. Vella,* 366 Mass. 651, 655, 321 N.E.2d 910 (1975) (quoting *Daniels v. Hudson River Fire Ins. Co.,* 66 Mass. (12 Cush.) 416, 425 (1853)); *see also Iannacchino,* 950 F.Supp. at 31 (facts are material where disclosure of truth would have influenced judgment of underwriter); *Shapiro,* 584 F.Supp. at 1249 (material facts include statements that mislead underwriter as to nature of risk or that heighten risk being insured against); *Barnstable County Ins. Co. v. Gale,* 425 Mass. 126, 128, 680 N.E.2d 42 (1997) (fact is deemed material if it influences premium).

■ In addition, misrepresentations under § 186 may include the omission or nondisclo-

---

19. By contrast, Massachusetts law does require life insurance and endowment insurance policies to attach a correct copy of the application in order for the application to be considered part of the policy. *See* Mass. Gen. Laws ch. 175, § 131.

sure of material information. *See Iannacchino,* 950 F.Supp. at 30–31; *Pahigian,* 349 Mass. at 86–87, 206 N.E.2d 660. Although the statute expressly allows rescission for misrepresentations made with actual intent to deceive, the misrepresentation need not be intentional to invalidate a policy, as long as the misrepresented matter increased the risk of loss.

■ Ordinarily, whether a misstatement is "material," in that it increases the risk of loss, is a question of fact for the jury. *McLean Hosp. Corp. v. Lasher,* 819 F.Supp. 110, 131 (D.Mass.1993); *Shapiro,* 584 F.Supp. at 1249; *Hanover Ins. Co. v. Leeds,* 42 Mass. App.Ct. 54, 57, 674 N.E.2d 1091 (1997). However, when the facts are not in dispute, courts have held that certain misrepresentations increase the risk of loss as a matter of law. *Hanover Ins.,* 42 Mass.App.Ct. at 57, 60, 674 N.E.2d 1091; *see also Iannacchino,* 950 F.Supp. at 32; *Shapiro,* 584 F.Supp. at 1249; *Pahigian,* 349 Mass. at 85, 206 N.E.2d 660.

The court will now turn to the alleged instances of misrepresentation.

### a. Questions 19(b) and 19(c)

■ The first category of alleged misrepresentations involves Heritage's failure to disclose the known conduct of Smith and Duarte in response to Questions 19(b) and 19(c) in the 1990 bond application.

Question 19(b) asked:

Have you any knowledge of, or information concerning any occurrence or circumstance whatsoever, which might materially affect this proposal? If so, you are required to state fully said occurrence or circumstance.

Question 19(c) asked:

Please state in detail, any irregularities in banking or financial operations discovered by, or under investigation by, governmental or banking authorities or known to the Bank during the past 3 years.

Heritage responded "No," and "None," respectively to these questions.

Defendants argue that Heritage's failure to disclose the facts known about Smith and Duarte amounted to material misrepresenta-tion because this concealment prevented defendants from being able to evaluate accurately the risks associated with the fidelity coverage Heritage sought, and, thereby, increased defendants' risk of loss as a matter of law. The court agrees.

At the risk of repetition, the court will briefly restate the facts known to Heritage at the time it completed the August 1990 bond application.

### Manuel Duarte

It is undisputed that Heritage terminated Duarte in March 1990 for serious delinquencies in his loan portfolio. After Duarte left the bank, Heritage hired Alfred Dean as a consultant to review Duarte's portfolio. Dean's discoveries prompted him to advise John Fridlington in May 1990 that Duarte had deliberately circumvented loan policy by making loans to third party proxies. Duarte's misconduct was reported to Heritage's Executive Committee in May and June 1990, and the situation was discussed at length at the Audit Committee meeting that July. Plaintiff has conceded that Heritage "discovered" the Duarte fidelity bond losses in April 1990.

### Michael Smith

The information known to Heritage with respect to Smith was both more extensive and more ominous. By the time Heritage completed the LPO 230A form in August 1990, it was aware of serious problems involving the Smith loans. In January 1989, it discovered the $900,000 to $1 million over advances given on the Cummington Farms project. An internal audit of Smith's portfolio conducted in February of that year revealed a host of similar over advances and loans made in excess of Smith's lending authority. The 1989 FDIC Examination and the 1989 Peat Marwick letter further confirmed problems with Smith loans, including shockingly poor documentation, as well as numerous violations of banking statutes and regulations. These discoveries led to Smith's (clearly forced) resignation in the summer of 1989.

After Smith left Heritage, the bank's growing concern about Smith's loans, as well as rumors of his properties in New Hamp-

shire and the Virgin Islands, prompted Heritage, in August 1989, to commit $45,000 to Goodwin, Procter & Hoar's confidential investigation of Smith's portfolio. Although GPH verbally reported to the Heritage Board that it had discovered insufficient evidence to require a report to the FDIC or to initiate a bond claim, it could not give complete assurances that no wrongful or criminal activity occurred without committing substantial funds to a broader investigation. While the GPH investigation was unable to locate the alleged properties in Smith's name, Jack Patterson confirmed Smith's interest in the New Hampshire property in early 1990. Patterson also heard several rumors that Smith had acquired two new cars, a boat, a fur coat, and a Rolex watch, possessions that seemed incongruous with his income.

In the spring of 1990, Patterson and Fridlington met with FDIC Examiner Lou Gonzales, and were told that the bank should have filed a Report of Apparent Crime on Smith for having exceeded his lending authority and for his repeated violations of banking policy. Gonzales let Patterson and Fridlington know that he intended to file such a Report himself, which he did in June 1990.

Heritage's unequivocal negative responses in August 1990 to Questions 19(b) and 19(c) failed to disclose the bank's awareness of these circumstances. As a matter of law, these misrepresentations concerned matters that increased the risk of loss to the defendants.

The objective information known to Heritage in August 1990 concerning the egregious misconduct of Smith and Duarte is certainly the kind of information a fidelity insurer would want to consider in estimating the degree and character of the risk involved, and in turn, in fixing the rate of the premium, or in deciding whether to enter into an insurance contract at all. *See Shapiro v. American Home Assur. Co.*, 584 F.Supp. 1245, 1249 (D.Mass.1984).

The obligations of Heritage to disclose what it knew about Smith and Duarte, and the consequences of its failure to do so, were established by the Court of Appeals more

than sixty years ago in *Nonantum Inv. Co. v. Maryland Cas. Co.*, 56 F.2d 329 (1st Cir. 1932). In that case, a corporation in the business of loaning money on second mortgages and on construction loans applied for a bond that insured the fidelity of the company's treasurer. One of the questions in the application asked the corporation to disclose any knowledge of any circumstances that might unfavorably affect the risk being insured. The company responded, "No." *Nonantum*, 56 F.2d at 331. In fact, the company had discovered shortly before completing the application that the treasurer had commingled $17,000 in corporate funds which he had used for his own purposes. *Id.* at 334.

The First Circuit ruled that the corporation's response on the application was a material misrepresentation, and that under Mass. Gen. Laws ch. 175, § 186, the misrepresentation vitiated the contract because it increased the risk of loss to the insurer as a matter of law. *Id.* at 335. The fact that the treasurer was engaging in such conduct was "so unreasonable and unusual in the management of corporate affairs" that it must have increased the risk of loss, because it was the sort of activity that often led to the type of losses covered. *Id.* As such, it was "indicative of a state of affairs which would deter any surety company from entering into [such a fidelity bond arrangement]." *Id.* The fact that the *corporation* may not have regarded the information as material was irrelevant: "It is immaterial whether the applicant did or did not actually or knowingly intend to deceive the defendant if as a matter of law the false representations increased the risk of loss." *Id.*

In this case, Heritage's failure to disclose in its application the highly "irregular" known circumstances surrounding Smith and Duarte obviously and indisputably increased the risk of loss to defendants. No fair argument to the contrary is conceivable. Even if the *bank* did not consider this information material—which is hard to imagine, if the Heritage officers gave the matter any thought at all—or did not believe at the time that it amounted technically to an insurable loss under the bond, the deliberate and repeated circumvention of loan policy and regu-

lations by Smith and Duarte was unreasonable and unusual in banking operations, and indicative of a state of affairs at Heritage that would give any underwriter pause before obligating itself to reimburse the bank for fidelity losses. It is important to remember that the bank was hiding damaging information about the very officers whose good faith the defendants were being asked to insure.

In summary, Heritage's failure to disclose (a) the conduct of Duarte and Smith, (b) the bank's internal reviews of both employees' portfolios and its retention of a private law firm to investigate the Smith loans, and (c) the FDIC's Report of Apparent Crime on Smith, increased the risk of loss to defendants, as a matter of law.

Heritage's nondisclosures in this case are "material," not because the information known to it at the time conclusively established a covered loss under the bond, but rather because the nondisclosures increased the risk of loss by depriving defendants of the opportunity to undertake a further investigation, which would have certainly influenced the underwriters in establishing the conditions of the bond and fixing the premium, or in considering the decision to issue the policy at all. *See Pahigian v. Manufacturers' Life Ins. Co.*, 349 Mass. 78, 86, 206 N.E.2d 660 (1965) (failure to give truthful answers deprived insurer of opportunity to undertake further investigation); *see also Northwestern Mut. Life Ins. Co. v. Iannacchino*, 950 F.Supp. 28, 32 (D.Mass.1997) (nondisclosure rendered insurer unaware of material facts and unable to discover such information through further investigation).

▮ The FDIC cannot argue that Questions 19(b) and 19(c) were overbroad or vague,[20] or that Heritage was not obligated to disclose the Smith and Duarte circumstances because the proposal form did not *specifically* ask the applicant to list or describe "violations of bank policy" or "regu-

lations relating to loan underwriting" or "Reports of Apparent Crime." *Any* commonsense interpretation of the questions encompasses the type of objective information known to Heritage in August 1990 concerning the egregious misconduct of Smith and Duarte.

▮ Moreover, plaintiff's claim that defendants waived any defense based on the nondisclosure of the Smith and Duarte circumstances fails. Plaintiff argues that defendants waived their right to a misrepresentation defense when, a year later, Lloyd's issued a renewal bond to Heritage and collected premiums for that bond in spite of the fact that Heritage had disclosed information about the Smith and Duarte situations in the 1991 renewal application.

It is well settled under Massachusetts law that "[w]aiver consists of the insurer's voluntary or intentional relinquishment of a known right." *Merrimack Mut. Fire Ins. Co. v. Nonaka*, 414 Mass. 187, 189, 606 N.E.2d 904 (1993). Plaintiff has not shown that defendants had "full knowledge" of the circumstances that warranted rescission of the 1990 bond when they issued the 1991 renewal bond, *see Niagara Fire Ins. Co. v. Lowell Trucking Corp.*, 316 Mass. 652, 657, 56 N.E.2d 28 (1944), and, therefore, cannot show that defendants intentionally relinquished a known right or engaged in intentional conduct inconsistent with that right.

In sum, Heritage's nondisclosure of this information in Questions 19(b) and 19(c) resulted in defendants' failure to receive the candid answers necessary for them to evaluate the fidelity risk involved. *Pahigian*, 349 Mass. at 86, 206 N.E.2d 660. The failure to disclose these facts—including the very facts that lie at the heart of plaintiff's present claim for recovery under the fidelity portion of the bond—plainly increased the risk of loss to the defendants. As such, defendants are entitled to rescission of the bond.

---

20. For example, plaintiff takes issue with the word "irregularities" in Question 19(c), and submits that, under the broadest sense of that term, Heritage had literally hundreds, if not thousands, of "irregularities" over the three-year period preceding the application. If the inference to be drawn from this argument is that Question 19(c) was so overbroad that Heritage could not possibly have listed all such "irregularities" in the application, Heritage's unequivocal response of "none" to Question 19(c) hardly supplies a truthful solution to the dilemma. In any event, this argument is specious. The misconduct of Smith and Duarte was "irregular" by any definition.

### b. Supplemental Question 2(b)

■ The second instance of alleged misrepresentation is Heritage's response to Question 2(b) of the Supplemental Questionnaire.

Question 2(b) asked:

Have there been any changes in either Directors or Officers during the last three years? If yes, please attach complete explanation for the changes and resumes of the new Directors and Officers.

Pl.'s Ex. 30b.

Heritage responded by referring defendants to its 1989 Annual Report. That report stated, in the context of a prefatory letter to Heritage's stockholders from President and CEO Richard Covell, that "as part of [the bank's] efforts to restructure and redirect our operations," Heritage had "trimmed down its management structure ... [by] eliminat[ing] sixteen ... positions, including those of seven ... officers." Pl.'s Ex. 83.

Defendants contend that this was an entirely inadequate response to Question 2(b), given that Duarte had been terminated, and Smith had been asked to resign, for their deliberate circumvention of bank lending policies. Plaintiff counters that Heritage's response to Question 2(b) was not false, and that it provided reasons for the changes in officers. Moreover, plaintiff argues, if defendants considered the response insufficient, it was their responsibility to ask follow-up questions.

■ A sophisticated underwriting entity probably should assume that a corporation's annual report to stockholders is likely to paint as glossy a picture of the business as is fairly supportable. Given this, perhaps it ought not accept a reference to such a report in response to this kind of question. Nonetheless, the court disagrees with plaintiff that the burden of inquiry necessarily shifts to the insurer to ask follow-up questions, espe-cially in a situation such as this, where the insured has provided virtually no indication to the insurer that follow-up questioning is necessary or warranted.[21]

Taken together with the nondisclosures in Questions 19(b) and 19(c), Heritage's failure to provide accurate and complete information explaining the changes in officers in response to Supplemental Question 2(b) worked further to deflect defendants' attention away from the serious known misconduct of Smith and Duarte. In that connection, the bank's response to the question again undermined defendants' accurate appraisal of the risk involved, and therefore increased the risk of loss on the bond.

### c. Question 19(a)

■ The final category of alleged misrepresentation concerns Heritage's response to Question 19(a) of the LPO 230A application form.

Question 19a asked:

Has any proposal for Insurance of this nature been declined by any Insurance Company or Underwriter at Lloyd's, or has any policy been canceled or renewal thereof refused? If so, state reasons.

Heritage responded, "No."

The parties agree that when the application was initially completed on August 1, 1990, St. Paul had not made its final decision regarding its coverage of Heritage. However, Heritage was informed on August 13, 1990 that St. Paul had elected not to renew. Defendants contend that Heritage was aware of St. Paul's decision before the bond took effect on September 1, 1990, and that its failure to update the application with this information amounted to misrepresentation. Moreover, defendants argue that this particular misrepresentation was made with actual intent to deceive defendants, because the various memoranda between Gordon Langan

---

**21.** Plaintiff cannot defend Heritage's incomplete response to Question 2(b) by pointing to other information provided in its application package that alluded to the fact that Heritage's losses lay largely in non-performing commercial loans, and that the "senior vice president of commercial lending" controlled a disproportionate share of the commercial loan portfolio. Plaintiff cannot credibly argue that this scattered information was either responsive to the question posed or that it put defendants on notice to ask whether the senior vice president mentioned was also one of the seven officers eliminated.

of A & A, and Irene Soucy and Richard Covell of Heritage, reveal that Heritage's "release of liability" arrangement with St. Paul was intended to avoid a "cancellation black mark" on Heritage's record, and allowed the bank to avoid having to disclose on future bond applications that it had been non-renewed or canceled by a previous carrier.

Plaintiff asserts that there was no need to supplement the response and inform the defendants of St. Paul's decision, absent a specific request from defendants. Furthermore, plaintiff avers that defendants already knew that the bond would not be renewed, because they regularly pursued the business of distressed U.S. banks that were domestically uninsurable, and because they were given the same financial information on Heritage that St. Paul had received. Finally, plaintiff maintains that there is no evidence that Heritage deliberately tried to mislead defendants into believing that the St. Paul bond had been or would be renewed, and instead characterizes the "release of liability" arrangement with St. Paul as comparable to a scheme where an employee is permitted to "resign" to avoid later having to disclose that he or she was in fact fired.

Perhaps Heritage's response to Question 19(a) would not, in itself, be sufficient to support a conclusion as a matter of law that defendants are entitled to rescission under § 186. However, viewed in combination with the bank's other acts of concealment, Heritage's response to Question 19(a) is further confirmation that the bank was doing everything it could to keep Lloyd's from having the opportunity to discover the full extent of the risk it was being asked to cover.

In conclusion, the court finds that Heritage withheld information connected to the misconduct of Smith and Duarte by failing to disclose known irregularities in their banking practices in response to Questions 19(b)-(c), and by failing to explain fully the bank's changes in officers in Supplemental Question 2(b). By failing to supplement its response to Question 19(a) Heritage concealed a red flag that might have prompted embarrassing inquiries into areas the bank wished to keep quiet. These misrepresentations were material in that they misled defendants as to the nature of the risk being undertaken, and thereby heightened defendants' risk of loss as a matter of law. As a result, defendants are entitled to rescission of the bond.[22]

## B. DISCOVERY

The defendants' misrepresentation defense is dispositive of plaintiff's claim for recovery under the 1990 bond. However, the record also establishes that Heritage provided untimely notice of its claim to defendants. For this reason, the parties' arguments regarding "discovery" warrant brief discussion.

As stated above, the 1990 Lloyds bond only covers loan-related losses that result directly from dishonest or fraudulent acts committed by an employee with the intent to make, and which result in, a financial benefit for the employee. Pl.'s Ex. 65 at 19. In addition, the bond applies only to losses "discovered" by the insured during the bond period. Under the terms of the bond, "discovery" occurs:

> when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known.

*Id.* at 13.

The "Notice" provision of the bond states:

> At the earliest practicable moment, not to exceed 30 days, after discovery of loss, the Insured shall give the Underwriter notice thereof.

*Id.*

Heritage provided notice of the Smith losses on August 30, 1991, when Joseph Barbato faxed a letter drafted by Goodwin, Procter & Hoar to Howden in London. Pl.'s Ex. 174.

---

**22.** Heritage's material misrepresentations on the 1990 bond application rendered the bond void *ab initio*. Although the issue does not appear in the parties' memoranda, plaintiff may be entitled to a return of the premiums. *See Nonantum Inv.* *Co. v. Maryland Cas. Co.,* 56 F.2d 329, 330 (1st Cir.1932); Joseph K. Powers, *Pulling the Plug on Fidelity, Crime and All Risk Coverage,* 32 Tort & Ins. L.J. 905, 934 (1997).

The FDIC argues that this August 30 notice was triggered by Heritage's "discovery" of the Smith losses on August 5, 1991, two years after Smith's forced resignation, when GPH attorney Mark Tully was contacted by FBI Special Agent T.J. Roberts. Therefore, according to plaintiff, Heritage's August 30, 1991 notice fell within the 30–day limit set forth in the bond.

Defendants contend that Heritage learned no new substantive information about Smith from Agent Roberts' phone call and argue that Heritage actually "discovered" the Smith losses well before July 30, 1991, or 30 days before notice was given. Heritage's notice of loss was therefore untimely, barring plaintiff's claim for recovery under the bond.

■ Notice provisions in fidelity bonds are valid and enforceable. *J.I. Corp. v. Federal Ins. Co.*, 730 F.Supp. 1187, 1189 (D.Mass.), *aff'd*, 920 F.2d 118 (1st Cir.1990). To deny a claim because of untimely notice, an insurer need not demonstrate actual prejudice resulting from the delay. *Id.* at 1190. Summary judgment is appropriate on the issue of untimely notice where there is no genuine dispute of fact that is material to determining the date of "discovery" of loss. *See FDIC v. Insurance Co. of N. Am.*, 928 F.Supp. 54, 58 (D.Mass.1996), *aff'd on other grounds*, 105 F.3d 778 (1st Cir.1997) ("*FDIC v. INA*"). The court need not consider whether a single event or document alone demonstrates discovery beyond the possibility of genuine dispute; it is sufficient, for purposes of summary judgment, if the only reasonable inference to be drawn from the combination of undisputed historical events is that "discovery" occurred outside the notice period. *Id.* at 61–62. In this case, defendants are entitled to summary judgment if plaintiff discovered the Smith losses prior to July 30, 1991.

In *FDIC v. INA*, a case involving virtually identical discovery and notice provisions in a financial institution bond, the court concluded that "discovery" requires the insured to have "awareness of facts that would cause an ordinarily prudent person to 'assume' that a loss of some kind had occurred." *FDIC v. INA*, 928 F.Supp. at 61. While the court in that case assumed, without deciding, that "mere

suspicion" of loss is not sufficient to constitute discovery, *id.* at 60, it held that this assumption no longer holds where the insured has "more than mere suspicion." *Id.* In other words, "discovery" *does* occur where suspicion is coupled with an awareness of facts that would cause an ordinarily prudent person, in the face of incomplete information, to choose to act on the assumption that a loss has been or will be incurred. *Id.*

■ Plaintiff claims that Heritage did not have "discovery" of the Smith losses prior to August 5, 1991, because until that date it was not aware of facts sufficient to assume that a "loss covered by the bond" had been or would be incurred. Specifically, Heritage claims it did not have sufficient knowledge that Smith had *received illicit financial benefits* as part of his improper loan activities until that date. Absent such knowledge, argues the FDIC, Heritage had no more than "mere suspicion" that a loss covered by the bond had been, or would be incurred. Plaintiff asserts that the critical knowledge regarding Smith's receipt of illicit financial benefits—and therefore "discovery" of the Smith losses—was provided to Heritage through FBI Agent Roberts' phone call on August 5, 1991.

For a number of reasons, the court cannot credit plaintiff's proposition that the August 5, 1991 phone call provided the critical missing link in the chain of information about Smith, such that "discovery" first occurred on that date.

First, the discovery provision of the bond does not require the insured to have *proof* of illicit financial benefit before notice must be given. The insured need only be "aware of facts" sufficient to "cause a reasonable person to *assume*" that a loss had occurred. Such language cannot be reasonably understood to require the insured *to believe with substantial certainty* that such loss had occurred. *FDIC v. INA*, 928 F.Supp. at 60. The court therefore rejects the FDIC's argument that "discovery" cannot be shown without proof that Heritage knew of Smith's receipt of financial benefit. *See id.*

■ Second, even assuming *arguendo* that "discovery" *did* require actual knowl-

edge of Smith's receipt of financial benefit, the record simply does not support plaintiff's contention that the August 5, 1991 phone call from Agent Roberts provided this information. According to GPH attorney Tully's handwritten notes from the conversation, Agent Roberts explained that he was actively investigating Smith and had been transferred from Boston to work exclusively on the case; the notes do not reflect any discussion of Smith's possible receipt of financial benefits. Pl.'s Ex. AP. Tully's deposition testimony is equally vague. He stated that Roberts could not comment on what he had learned through the grand jury, and "did not give details," yet Tully's "sense" was that Roberts was "indicating" that he had such evidence of financial benefit. Tully Dep. at 164–65. John Fridlington's testimony further erodes plaintiff's position. Fridlington stated that he did not recall Tully telling him prior to Heritage's August 30, 1991 notice that Agent Roberts had provided any information regarding Smith. Fridlington Dep. vol. II at 79. In fact, Fridlington stated that he did not believe that Heritage "had learned specific new information" in August 1991, but that there was "just a continuation of reinforcement of suspicions . . . that sort of I think at some point said to us it was a sufficient magnitude of suspicion that we reached that we ought to do something." *Id.* at 78.

Plaintiff cannot credibly argue, based on this evidence, that Tully's conversation with Agent Roberts provided the critical knowledge that tipped the balance, but that a $45,000 confidential investigation, a Report of Apparent Crime, the November 1990 meeting with FBI Agent Scripture, two grand jury subpoenas, knowledge of extraordinary assets incommensurate with Smith's salary, and a suspicious pattern of missing ownership interests in real estate partnerships involving Smith's friends and customers collectively fell short of "discovery." Plaintiff's position is simply untenable. On the contrary, these pre-August 1991 events represent far more than "mere suspicion." In-

deed, if a "smell test" were in order, the smell by late spring 1991 was "rank indeed." *FDIC v. INA,* 105 F.3d 778, 783 (1st Cir. 1997), *aff'g* 928 F.Supp. 54 (D.Mass.1996). The only reasonable inference to be drawn from this combination of undisputed historical events is that "discovery" had occurred well before August 1991.

In fact, it seems obvious that the supposed August 5, 1991 date of discovery was merely an *ex post facto* attempt by Heritage to explain its decision to give notice just two days before the 1990 bond expired and the 1991 renewal bond—which contained a loss sustained rider that would have barred recovery for any losses caused by Smith's prior conduct—was to take effect.

The plain and unavoidable reality is that the facts known to Heritage by spring 1991, at the latest, were sufficient to lead a reasonable person to assume that a loss caused by Smith's dishonesty (as opposed to a loss caused merely by poor banking practices) had been or would be incurred. As a result, Heritage's notice on August 30, 1991 was untimely.

Because it is not necessary to the court's finding that discovery occurred outside the 30–day notice period, the court need not address defendants' argument that the losses attributed to Smith are not covered by the bond because "discovery" occurred even before the bond took effect. Likewise, the court need not address defendant's separate contention that, pursuant to the bond's "Cancellation or Termination" provision, the bond "terminated" prior to its inception as to Smith when Heritage learned of many of Smith's dishonest or fraudulent acts.[23] The court does not express any opinion as to these two arguments.

## IV. CONCLUSION

Counsel for the FDIC has argued, with some force, that it is unfair to permit an insurer to charge an enhanced premium based on a bank's obviously shaky condition,

---

**23.** Section 12(d) of the bond's "Cancelation or Termination" provision holds: "This bond shall be deemed terminated as to any Employee . . . as soon as any Insured . . . shall learn of any dis-

honest or fraudulent act committed by such person at any time against the insured or any other person or entity. . . ." Pl.'s Ex. 65 at 30.

then refuse to cover losses when the institution suffers an unsurprising collapse. Such a "heads-I-win-tails-you-lose" approach would permit the defendants to pocket large premiums with little risk.

This is a compelling argument, but it is indisputably not what occurred here. Instead, the record demonstrates conclusively that Heritage officers made misrepresentations in the policy application, hiding ugly facts they knew regarding one of the prominent causes of the bank's decline: the misconduct and ineptitude of some of the bank officials themselves. It is one thing for an insurer to take on the risk that a competently operated banking institution will be overwhelmed by adverse economic conditions. It is quite another for the officials to conceal their colleagues' misconduct. The misrepresentations made by Heritage in this case significantly, and secretly, increased the risk defendants were covering. Under controlling Massachusetts law this misconduct gave the defendants the right to rescind.

Beyond this, Heritage officers waited until *long* after any reasonable person would have known that losses under the bond had been or would be incurred before notifying the defendants. The protestation that "discovery" did not occur until the August 5, 1991 phone call with FBI Special Agent Roberts is simply an after-the-fact concoction.

These two conclusions—misrepresentation and failure to give timely notification—are *overwhelmingly supported by the undisputed* facts of record. This lengthy saga may be the final chapter in the sad story of the Heritage Bank for Savings.

Defendants' motion for summary judgment will be ALLOWED, and plaintiff's cross motion will be DENIED. A separate order will issue.

### ORDER

For the reasons stated in the accompanying Memorandum, defendants' Motion for Summary Judgment is hereby ALLOWED. Plaintiff's cross-motion is hereby DENIED.